# United States Court of Appeals
## For the First Circuit

---

No. 01-9010

IN RE:  STEPHEN J. JAMO AND LYNN M. JAMO,
Debtors.

---

STEPHEN J. JAMO AND LYNN M. JAMO,
Plaintiffs, Appellees,

v.

KATAHDIN FEDERAL CREDIT UNION,
Defendant, Appellant.

---

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
OF THE FIRST CIRCUIT

---

Before

Selya, <u>Circuit Judge</u>,

Stahl, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

---

    <u>Daniel L. Cummings</u>, with whom <u>Norman, Hanson & DeTroy, LLC</u> was on brief, for appellant.
    <u>George J. Marcus</u>, with whom <u>Lee H. Bals</u> and <u>Marcus, Clegg & Mistretta, P.A.</u> were on brief, for Maine Credit Union League and Credit Union National Association, amici curiae.
    <u>Richard D. Violette, Jr.</u> for appellees.

---

March 26, 2002

---

**SELYA, Circuit Judge.** This bankruptcy appeal requires us to decide an issue of first impression at the circuit level: In a Chapter 7 case, may a lender who is owed both secured and unsecured debts insist upon reaffirmation of the latter as a condition to reaffirmation of the former? The bankruptcy court ruled that such an "all or nothing" negotiating posture amounted to a per se violation of the automatic stay, Jamo v. Katahdin Fed. Credit Union, 253 B.R. 115 (Bankr. D. Me. 2000) [Jamo I], and the bankruptcy appellate panel (the BAP) agreed, Katahdin Fed. Credit Union v. Jamo, 262 B.R. 159 (B.A.P. 1st Cir. 2001) [Jamo II]. We reverse.

## I. BACKGROUND

The critical facts are not in dispute. On March 18, 1999, the debtors, Stephen J. Jamo and Lynn M. Jamo (husband and wife), initiated proceedings under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701-766. On the filing date, they owed $61,010 to Katahdin Federal Credit Union (the credit union). This indebtedness was composed of $37,079 owed on a promissory note secured by a first mortgage on their residence in Millinocket, Maine; $12,731 owed on unsecured personal loans; and $11,200 owed on credit cards.

In their bankruptcy petition, the debtors indicated that they desired to reaffirm the mortgage obligation. When

their attorney inquired about reaffirmation, the credit union responded, through counsel, that it would not enter into a reaffirmation agreement unless the debtors also agreed to reaffirm their other indebtedness with the credit union. In taking this position, the credit union cited a "long-standing" policy that stated in relevant part:

> It shall be the policy of [the credit union] to allow members to reaffirm debts owed to the credit union. If members have more than one debt with [the credit union], all debts must be reaffirmed or re-written (post-petition). Reaffirmation will not be granted to members who wish to have some debts excused (discharged), and to reaffirm others.

Initially, the debtors' counsel tried to get the credit union to accept a reaffirmation of the secured indebtedness alone. When that effort failed, he signaled that the debtors would consider reaffirming all of their obligations to the credit union. The credit union then proposed a comprehensive reaffirmation package that bundled the debtors' outstanding obligations into two loans (each secured by a home mortgage) and dramatically reduced the debtors' total monthly payments. The debtors executed the papers presented by the credit union.

The deal came a cropper when the debtors' counsel balked. See 11 U.S.C. § 524(c)(3)(A)-(B) (stipulating that, as a condition precedent to reaffirmation, counsel for a

represented debtor must certify that the agreement "represents a fully informed and voluntary agreement by the debtor . . . [and] does not impose an undue hardship on the debtor"). In refusing to approve the arrangement, the lawyer singled out the proposed reaffirmation of the unsecured debts and questioned whether his clients were "succumbing to the extortion that is inherently present in the Credit Union's all or nothing approach to reaffirmation."

The "linked" reaffirmation agreements were filed with the bankruptcy court. Absent counsel's stamp of approval, however, the court had no choice but to reject them.[1]

The debtors promptly notified the credit union that they remained willing to reaffirm the mortgage, shorn of any linkage to the unsecured debts. Further negotiations ensued. The credit union and the debtors reached a second accord, this time purposing to reaffirm the secured indebtedness on its original terms and to reaffirm the unsecured debts without interest. Despite these changes, the debtors' lawyer remained adamant in his refusal to endorse the arrangement.

---

[1]The reaffirmation papers were presented to the bankruptcy court eighteen days after the court entered a general discharge. Because this sequencing violated 11 U.S.C. § 524(c)(1), the debtors moved to vacate the discharge for the limited purpose of allowing consideration of the reaffirmation agreements. There being no objection, the bankruptcy court granted the motion. See 11 U.S.C. § 727(a)(10).

Although the revised agreements lacked the imprimatur of the debtors' counsel, the debtors filed them with the bankruptcy court. The debtors then commenced an adversary proceeding charging the credit union with a violation of the automatic stay, 11 U.S.C. § 362(a)(6), and seeking sanctions. After some skirmishing (not relevant here), the bankruptcy court concluded that the credit union's efforts to condition reaffirmation of the mortgage debt upon the simultaneous reaffirmation of other (unsecured) debts violated the automatic stay in two ways. Jamo I, 253 B.R. at 127-30. First, the credit union's insistence upon linkage constituted an impermissibly coercive attempt to "strong-arm" the debtors into reaffirming their separate, unsecured obligations. Id. at 127-29. Second, the credit union had engaged in prohibited conduct by threatening to foreclose on the debtors' home. Id. at 129-30.

Consistent with these conclusions, the court enjoined the credit union from (1) foreclosing on the mortgage for any bankruptcy-related reason, (2) calling the mortgage on account of an asserted payment default for at least one year, (3) collecting (or attempting to collect) any attorneys' fees or costs accruing prior to the effective date of the injunction, (4) conditioning any reaffirmation of the mortgage debt upon the

debtors' reaffirmation of their unsecured obligations, and (5) withholding its consent to reaffirmation of the mortgage debt on the terms specified in the original loan documents. Id. at 130. Effectively, then, the bankruptcy court overrode the parties' agreement to reaffirm the unsecured debts and (as a sanction) compelled reaffirmation of the mortgage debt on its original terms. To cap matters, the court awarded attorneys' fees and costs to the debtors. Id. at 130-31.

The credit union appealed, but the BAP affirmed the judgment. Jamo II, 262 B.R. at 165-68. This further appeal ensued.

## II. THE MERITS

We traverse an analytical path that delineates the structure of, and the relationship between, two mainstays of the Bankruptcy Code: reaffirmation and the automatic stay. We turn then to the question of whether the credit union transgressed the automatic stay either by conditioning reaffirmation of the mortgage indebtedness upon the reaffirmation of separate, unsecured obligations, or by engaging in strong-arm tactics.

### A. The Statutory Interface.

To put this case into perspective, it is necessary to understand how the practice of reaffirmation and the operation

of the automatic stay implicate bankruptcy practice.  We turn to that task.

**1.  Reaffirmation.**  Within thirty days of filing a bankruptcy petition, a Chapter 7 debtor must serve a statement of intention with respect to outstanding consumer debts that are secured by property of the bankrupt estate.  11 U.S.C. § 521(2)(A).  The debtor may, of course, surrender the collateral to the secured creditor.  Id.  To retain it, however, he must (a) demonstrate the applicability of a recognized bankruptcy exemption, (b) pay off the secured creditor in full (thereby redeeming the collateral), or (c) reaffirm the secured debt.[2] Id.  The focus here is on reaffirmation.

The reaffirmation option is spelled out in 11 U.S.C. § 524(c).  We recently explained that section 524(c) requires reaffirmation agreements to satisfy five general criteria.  Such an agreement must

> (i) be executed before the [general] discharge has been granted;
> (ii) be in consideration for a dischargeable debt, whether or not the debtor waived discharge of the debt;

---

[2]The case law in this circuit indicates that these three options are exclusive.  Bank of Boston v. Burr (In re Burr), 160 F.3d 843, 847-48 (1st Cir. 1998).  That view is contradicted by other authority.  E.g., McClellan Fed. Credit Union v. Parker (In re Parker), 139 F.3d 668, 673 (9th Cir. 1998).  We need not explore that conflict today.

(iii) include clear and conspicuous statements that the debtor may rescind the reaffirmation agreement at any time prior to the granting of the general discharge, or within sixty days after the execution of the reaffirmation agreement, whichever occurs later, and that reaffirmation is neither required by the Bankruptcy Code nor by nonbankruptcy law;
(iv) be filed with the bankruptcy court; and
(v) be accompanied by an affidavit of the debtor's attorney attesting that the debtor was fully advised of the legal consequences of the reaffirmation agreement, that the debtor executed the reaffirmation agreement knowingly and voluntarily, and that the reaffirmation agreement would not cause the debtor "undue [e.g., financial] hardship."

Whitehouse v. LaRoche, 277 F.3d 568, 574 (1st Cir. 2002).

There is, however, an overarching requirement. Section 524(c) makes manifest that reaffirmation requires a meeting of the minds. The statutory text uses the word "agreement" no less than nineteen separate times, and this pervasive emphasis can only mean that Congress envisioned reaffirmations as consensual. In conventional legal parlance the essence of an agreement is the existence of mutual consent, e.g., Black's Law Dict. 67 (7th ed. 1999); Restatement (Second) of Contracts § 3 (1981), and the presumption is "that Congress knew and adopted the widely accepted legal definitions of meanings associated with the specific words enshrined in the statute," United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001).

-8-

We conclude, therefore, that section 524(c) envisions reaffirmation agreements as the product of fully voluntary negotiations by all parties. Whitehouse, 277 F.3d at 575; Bell v. Gen. Motors Acceptance Corp. (In re Bell), 700 F.2d 1053, 1056 (6th Cir. 1983). Two things follow from this conclusion. First, both the creditor and the debtor must consent to reaffirmation. See In re Turner, 156 F.3d 713, 718 (7th Cir. 1998); Home Owners Funding Corp. v. Belanger (In re Belanger), 962 F.2d 345, 348 (4th Cir. 1992); see also 4 Collier on Bankruptcy ¶ 524.04[1] (15th rev. ed. 2001) ("[T]o be an enforceable agreement, the reaffirmation agreement must . . . be one to which both the debtor and creditor agree."). Second, just as a debtor is not obliged to seek reaffirmation, so too a creditor retains the right to reject any and all reaffirmation proposals, for whatever reason. In re Turner, 156 F.3d at 718-19; Brown v. Pa. State Employees Credit Union (In re Brown), 851 F.2d 81, 85 (3d Cir. 1988); In re Bell, 700 F.2d at 1056.

We add a caveat. Although reaffirmation is consensual in nature, the myriad safeguards erected by Congress reflect its recognition that a debtor's decision to enter into a reaffirmation agreement is likely to be fraught with consequence. In point of fact, reaffirmation represents the only vehicle through which an otherwise dischargeable debt can

survive the successful completion of Chapter 7 proceedings. Moreover, once a debt is reaffirmed, the creditor can proceed to enforce its rights as if bankruptcy had not intervened. Because reaffirmation constitutes a debtor-invoked exception to the tenet that underpins the bankruptcy system — the "fresh start" principle — a reaffirming debtor must be afforded some protection against his own (potentially) short-sighted decisions.

Section 524(c) reflects Congress's intent to provide this protection, thereby safeguarding debtors against unsound or unduly pressured judgments about whether to attempt to repay dischargeable debts. In re Duke, 79 F.3d 43, 44 (7th Cir. 1996); 4 Collier on Bankruptcy, supra, ¶ 524.04. To cloak debtors in this protective garb, courts generally have insisted that reaffirmation agreements strictly comply with the conditions enumerated in the statute. E.g., Whitehouse, 277 F.3d at 575; DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002); Bessette v. Avco Fin. Svcs., 230 F.3d 439, 444 (1st Cir. 2000), cert. denied, 532 U.S. 1048 (2001). By like token, courts have insisted upon a showing that a reaffirmation agreement is not the product of abusive creditor practices. In re Duke, 79 F.3d at 44-45.

**2.  The Automatic Stay.**  The automatic stay is one of the fundamental protections that the Bankruptcy Code affords to debtors.  As its name suggests, the stay springs into effect upon the filing of a bankruptcy petition.  Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 113 (1st Cir. 1994).  The stay effectively suspends all collection efforts (including foreclosures), thus giving the debtor breathing room.  See Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 975 (1st Cir. 1997); see also 11 U.S.C. § 362(a)(6) (prohibiting "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy proceeding]").  The automatic stay remains in effect unless and until a federal court either disposes of the underlying case, 11 U.S.C. § 362(c)(2), or grants relief to a particular creditor, id. § 362(d)-(f).

**3.  The Interplay.**  Congress's encouragement to creditors and debtors alike to move expeditiously to negotiate reaffirmation agreements is in some tension with the automatic stay.  Although Congress has explicitly excepted a handful of actions from the purview of the stay, see id. § 362(b)(1)-(18), this enumeration does not include the negotiation of reaffirmation agreements.  Taken to an extreme, the automatic stay could be construed to prohibit all post-petition contact

-11-

between creditors and debtors pertaining to dischargeable debts, including the negotiation of reaffirmation agreements. But the Bankruptcy Code should be read as a whole, with a view toward effectuating Congress's discerned intent. MSR Exploration, Ltd. v. Meridian Oil, Inc., 74 F.3d 910, 914 (9th Cir. 1996). Such a commonsense approach leads us to reject a reading of the automatic stay provision that would effectively preclude all post-petition negotiations anent reaffirmation. To read the automatic stay provision that expansively would emasculate section 524(c) and thwart Congress's evinced intent of allowing parties to reach arm's-length reaffirmation agreements without undue delay. As the Seventh Circuit astutely observed:

> The option of reaffirming would be empty if creditors were forbidden to engage in any communication whatsoever with debtors who have pre-petition obligations. If that were the rule, it is also hard to see what purpose the detailed rules governing enforceability of reaffirmation agreements contained in § 524(c) would serve.

In re Duke, 79 F.3d at 45.

To be sure, there is a fine line between hard-nosed negotiations and predatory tactics — and if the automatic stay is to have any bite, it must forfend against the latter. Courts have labored long to plot this line. The most sensible rule — and one that we endorse — is that a creditor may discuss and negotiate terms for reaffirmation with a debtor without

-12-

violating the automatic stay as long as the creditor refrains from coercion or harassment. Cox v. Zale Del., Inc., 239 F.3d 910, 912 (7th Cir. 2001); Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 423 (6th Cir. 2000). We believe that this measured approach gives effect to all parts of the statutory scheme, affording all parties a reasonable opportunity to consummate binding reaffirmation agreements while at the same time shielding debtors from unseemly creditor practices. Accordingly, we hold that, while the automatic stay is in effect, a creditor may engage in post-petition negotiations pertaining to a bankruptcy-related reaffirmation agreement so long as the creditor does not engage in coercive or harassing tactics.

## B.  **The Attempt at Linkage**.

This brings us to the question of linkage: whether a creditor's attempt to condition reaffirmation of a secured debt upon reaffirmation of separate, unsecured debts crosses the line and should be deemed coercive as a matter of law. Both the bankruptcy court, Jamo I, 253 B.R. at 127-29, and the BAP, Jamo II, 262 B.R. at 165-66, answered that question affirmatively. For purposes of our review, "we focus on the bankruptcy court's decision, scrutinize that court's findings of fact for clear error, and afford de novo review to its conclusions of law,"

without according any special deference to the BAP's pronouncements.  Brandt v. Repco Printers & Litho., Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997).

There are two different ways in which a debtor might prevail on the linkage issue.  The first is if a per se rule applies, that is, if any and all efforts by creditors to construct such a tie are deemed inherently coercive (and, therefore, violative of the automatic stay).  The second is fact-specific; even if an "all or nothing" negotiating posture is not per se coercive, a creditor still might violate the automatic stay by articulating or acting upon that policy in an inappropriate manner during the course of negotiations.  We examine both alternatives.

**1.    The Per Se Rule.**  Both lower courts took the position that a creditor's refusal to reaffirm a secured debt unless the debtor simultaneously agrees to reaffirm additional, unsecured debts constitutes a per se violation of the automatic stay.  Jamo II, 262 B.R. at 165-66; Jamo I, 253 B.R. at 127-29.  This is an abstract legal proposition, and, as such, engenders de novo review.  229 Main St. Ltd. P'ship v. Mass. Dep't of Envtl. Prot. (In re 229 Main St. Ltd. P'Ship), 262 F.3d 1, 3 (1st Cir. 2001); In re Soares, 107 F.3d at 973.

-14-

To some extent, we write on a pristine page: no federal court of appeals has spoken to the issue. There is, however, a smattering of apposite case law. The bankruptcy courts that have addressed the question mostly reject a per se rule. See, e.g., In re Brady, 171 B.R. 635, 639-40 (Bankr. N.D. Ind. 1994); In re Briggs, 143 B.R. 438, 460 (Bankr. E.D. Mich. 1992); Schmidt v. Am. Fletcher Nat'l Bank & Trust Co. (In re Schmidt), 64 B.R. 226, 228-29 (Bankr. S.D. Ind. 1986); but see Green v. Nat'l Cash Register Co. CI Corp. Sys. (In re Green), 15 B.R. 75, 78 (Bankr. S.D. Ohio 1981) (holding that such an attempt at linkage is inherently coercive and, therefore, violates the automatic stay).

We too reject a per se rule. When an individual debtor voluntarily files for bankruptcy, he usually has the option of proceeding under either Chapter 7 or Chapter 13. Unlike Chapter 7, Chapter 13 contains a "cram down" provision, 11 U.S.C. § 1325(a)(5)(B), which permits a debtor to retain the collateral underlying a secured obligation without the creditor's approval. Bank of Boston v. Burr (In re Burr), 160 F.3d 843, 848 (1st Cir. 1998). Even if a debtor belatedly decides that "cramming down" is in his best interest, a decision to file under Chapter 7 ordinarily is not irrevocable. The Bankruptcy Code, with only a few exceptions, see 11 U.S.C. § 706(a), allows a debtor who

-15-

initially has filed for Chapter 7 relief to jump midstream to Chapter 13.

Conversely, a debtor who persists in traveling the Chapter 7 route knows that reaffirmation depends entirely on his ability to come to terms with the secured creditor. He also knows (or, at least, has every reason to expect) that the creditor may drive a hard bargain. Hence, a debtor must bear some degree of responsibility for choosing to proceed under Chapter 7.

Perhaps more important, the Bankruptcy Code does not outlaw linkage as an element of reaffirmation negotiations. The absence of such a prohibition makes sense, for a secured creditor's insistence on linkage does not force a debtor to reaffirm unsecured obligations. As we have explained, reaffirmation agreements are consensual, and a debtor always has the option of walking away from an unattractive proposal.[3]

Of course, a debtor whose home is at stake is in an unenviable position. But a Chapter 7 discharge is not a walk in the park; it is "a benefit that comes with certain costs." <u>In re Burr</u>, 160 F.3d at 848. Consequently, a Chapter 7 debtor is

---

[3]In point of fact, a debtor is the only party empowered to seek the bankruptcy court's approval of a reaffirmation agreement. <u>See</u> Fed. R. Bankr. P. 4008; <u>see</u> <u>also</u> <u>Whitehouse</u>, 277 F.3d at 571 n.1; 4 <u>Collier on Bankruptcy</u>, <u>supra</u>, ¶ 524.04.

-16-

not inoculated against the necessity for making hard choices. If the debtor surrenders his home, he is entitled to erase all his debts (secured and unsecured) and start afresh. If, however, his paramount interest is in keeping his home and he cannot redeem the collateral, he must come to terms with the mortgagee. Bankruptcy, as life itself, is a series of tradeoffs.

The debtors argue for a per se rule on policy grounds, but we doubt the prophylactic effects of such a rule. Creditors, as a class, have a highly developed instinct for self-protection, and, as the amici point out, such a rule could open Pandora's jar and produce a distinctly unfavorable climate for debtors. Creditors might become more reluctant to extend both secured and unsecured loans to a particular debtor, or might insist upon cross-collateralization clauses in all loans, or might categorically decide that foreclosure is a more judicious option than reaffirmation negotiations restricted to a single secured debt. Then, too, a creditor intent on negotiating for a "linked" reaffirmation arrangement simply could petition for relief from the automatic stay and refuse to negotiate until such relief had been obtained. This would not only delay the Chapter 7 proceedings, but also increase the ultimate cost of reaffirmation to the debtor. For these

reasons, we find the debtors' policy-based arguments lacking in force.

That ends this inquiry. Based on the foregoing analysis, we reject the proposition that a creditor's decision to withhold reaffirmation of a secured debt unless the debtor agrees to reaffirm other, unsecured debts amounts to a per se violation of the automatic stay.

**2. The Credit Union's Conduct.** Even if a creditor's attempt to condition reaffirmation of a secured debt upon reaffirmation of other, unsecured obligations does not constitute a per se violation of the automatic stay, the question remains whether the creditor's conduct in a particular instance amounts to a violation of the automatic stay. While we review the bankruptcy court's findings of fact for clear error, Boroff v. Tully (In re Tully), 818 F.2d 106, 108 (1st Cir. 1987), we afford plenary review to the question of whether the evidence is legally sufficient to support particular findings. Here, the bankruptcy court calumnized the credit union for improperly bringing "leverage" to bear on the debtors' reaffirmation decision and, relatedly, for menacing the debtors with threats of foreclosure. Jamo I, 253 B.R. at 129-30. To the extent that these are findings that the credit union engaged

in impermissibly coercive conduct, they lack adequate record support. We explain briefly.

The bankruptcy court's condemnation of the credit union for using its leverage manifests a fundamental misunderstanding of a creditor's rights vis-à-vis a debtor. In and of itself, the act of filing a bankruptcy petition negates the original pre-bankruptcy bargain between debtor and creditor. In re Burr, 160 F.3d at 848 (explaining that Chapter 7 debtors have no right "to maintain with their secured creditors advantageous arrangements in place prior to filing"). Thus, subject only to the constraints imposed by section 524(c) or by other provisions of the Bankruptcy Code, the parties to a secured obligation are free to strike a new bargain.

So viewed, the bankruptcy court's condemnation of the credit union's use of leverage amounts to a variation of its per se rule — a rule that we already have rejected. See supra Part II(B)(1). A reaffirmation negotiation — like any other negotiation — contemplates give and take between the participants. The fact that one party has a superior bargaining position does not warrant a court in placing a thumb on the scales. See In re Burr, 160 F.3d at 848 (recognizing that an oversecured creditor may attempt to use its "superior bargaining power" to obtain creditor-favorable terms in negotiating

reaffirmation agreements without violating the automatic stay); see also In re Briggs, 143 B.R. at 454 (declaring that it would be "absurd" to interpret the Bankruptcy Code as prohibiting a secured creditor from using its leverage in negotiating a reaffirmation agreement).

That leaves the so-called threats of foreclosure. In theory, threats of foreclosure or repossession might justify a finding that a secured creditor has violated the automatic stay. See In re Duke, 79 F.3d at 44-45; see also In re Brown, 851 F.2d at 86 (noting that the automatic stay continues to preclude creditor communications that "threat[en] immediate action by creditors, such as a foreclosure or a lawsuit"). The facts of this case, however, do not support such a finding.

The bankruptcy court focused on written, rather than oral, communications. In corresponding with the debtors (or, more precisely, with the debtors' counsel), the credit union sent a total of nine separate reaffirmation-related letters. In those letters, it referred three times to foreclosure. The question, then, is whether these references, read favorably to the bankruptcy court's finding, plausibly can be deemed coercive. We think not.

The first mention of foreclosure came in a response to the debtors' initial request for reaffirmation of the mortgage

indebtedness. After outlining the credit union's "all or nothing" policy, its lawyer asked the debtors' counsel to ascertain whether the debtors "will be discharging all their obligations," and if so, whether "they would be amenable to a deed in lieu of foreclosure."

The second foreclosure reference transpired after the bankruptcy court rejected the initial reaffirmation proposal. At that point, the debtors' attorney declared that his clients were willing to reaffirm the mortgage indebtedness (but no other obligations) and vowed "to fully litigate any foreclosure action" instituted by the credit union. Responding to this vow, the credit union's counsel wrote that:

> [I]t was the Credit Union's desire that the Parties could have arrived at a mutually agreeable resolution. As foreclosing was not on the Credit Union's agenda, it would be premature to extensively respond to your assertions . . . . Should the Credit Union eventually foreclose, however, the terms of the Jamos' note and mortgage are that the Jamos are liable for the Credit Union's costs and fees of enforcing the obligation, and therefore, should the Credit Union prevail, the amount due increases rapidly as a result of all this litigation. Of course, the Jamos are not personally exposed to this liability, but such sums are secured by the mortgage.

The third reference came in a letter to the debtors that limned the terms of the second reaffirmation proposal. In that epistle, the credit union's lawyer expressed his belief

-21-

that the contemplated overall reduction in payments would "eliminat[e] the risks of future litigation, including foreclosure."

These references were unarguably benign. The first letter merely inquired whether the debtors, if they decided to discharge all their debts (including the mortgage indebtedness), would be willing to deliver a deed to the credit union in lieu of foreclosure. The next letter was nothing more than a temperate response to statements made by the debtors' counsel. Far from hanging the Damoclean sword of foreclosure over the debtors' heads, the credit union accurately delineated the debtors' foreclosure-related liability and made clear that foreclosure "was not on [its] agenda." The final reference to foreclosure was likewise innocuous; in context, it cannot reasonably be deemed tantamount to a threat.

To say more on this point would be supererogatory. Because the credit union's passing references to foreclosure cannot reasonably be construed as threatening "immediate action" against the debtors, In re Brown, 851 F.2d at 86, those references were not impermissibly coercive. Accordingly, the credit union did not violate the automatic stay.

III. THE REMEDY

-22-

The question of remedy remains. Although the bankruptcy court erred in finding a violation of the automatic stay, its disapproval of the linked reaffirmation agreements is supportable on an independent ground. The critical datum is that the debtors' attorney, believing that reaffirmation on the agreed terms was not in the debtors' best interest, refused to approve the arrangement. Absent counsel's approbation, no valid reaffirmation could occur.[4] 11 U.S.C. § 524(c)(3); Whitehouse, 277 F.3d at 575 (explaining that a represented debtor must strictly comport with section 524(c) criteria to effect a valid reaffirmation).

The bankruptcy court's granting of injunctive relief, attorneys' fees, and costs against the credit union is less easily defended. We review a bankruptcy court's imposition of sanctions for abuse of discretion. Schwartz v. Kujawa (In re Kujawa), 270 F.3d 578, 581 (8th Cir. 2001). Here, however, both the injunctive relief and the assessment of fees and costs rest

---

[4]There is an interesting question as to whether section 524 requires bankruptcy court approval of a reaffirmation agreement if the debtor's counsel has approved it. See Rein v. Providian Fin. Corp., 270 F.3d 895, 901 n.9 (9th Cir. 2001) (discussing this point); see also BankBoston, N.A. v. Nanton, 239 B.R. 419, 423-25 (Bankr. D. Mass. 1999) (asserting that the bankruptcy court retains the authority to approve or disapprove reaffirmation agreements involving a represented debtor, notwithstanding approval by the debtor's counsel). We have no occasion to reach that question here.

squarely on the court's erroneous determination that the credit union violated the automatic stay. Thus, these aspects of the court's order cannot endure. See Sunshine Dev., 33 F.3d at 117 (dissolving injunction that erroneously restrained FDIC from exercising its lawful powers); see also In re Grand Jury Subpoena, 138 F.3d 442, 444 (1st Cir. 1998) (explaining that "a court that predicates a discretionary ruling on an erroneous view of the law inevitably abuses its discretion").

In an attempt to keep the remedial order intact, the debtors rely upon 11 U.S.C. § 105(a). Their reliance is mislaid.

Section 105(a) — a statute that empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate" to effectuate the provisions of the Bankruptcy Code — supplies a source of authority for the bankruptcy court's imposition of sanctions in an appropriate case. See Bessette, 230 F.3d at 445; Hardy v. United States ex rel. IRS (In re Hardy), 97 F.3d 1384, 1389-90 (11th Cir. 1996). But section 105(a) does not provide bankruptcy courts with a roving writ, much less a free hand. The authority bestowed thereunder may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code. See Norwest

-24-

Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) (explaining that a bankruptcy court's equitable powers "can only be exercised within the confines of the Bankruptcy Code"); Noonan v. Sec'y of HHS (In re Ludlow Hosp. Soc'y, Inc.), 124 F.3d 22, 27 (1st Cir. 1997) (similar).

The relief ordered below falls short of this benchmark. The bankruptcy court's order was designed to implement the reaffirmation option limned in section 524(c). As said, see supra Part II(B), the order failed in this endeavor: forced to operate without much precedential guidance, the court misapprehended the interplay between section 524(c) and section 362(a), mischaracterized lawful conduct as impermissibly coercive, and issued a flawed order. Absent any antecedent violation either of the automatic stay or of some other independent provision of the Bankruptcy Code, the bankruptcy court lacked the power, section 105(a) notwithstanding, to modify the proposed reaffirmation arrangement, compel the credit union to enter into a judicially-crafted reaffirmation agreement, or award monetary sanctions in the form of attorneys' fees and costs.

## IV. CONCLUSION

We need go no further. We neither underestimate the difficulty of the question presented nor disparage the lower

-25-

courts' thoughtful attempts to resolve it.  In the end, however, we see the matter differently.  Consequently, we reverse the decision of the BAP and remand the case to that tribunal with directions to vacate the bankruptcy court's judgment and to remand the matter to the bankruptcy court for further proceedings consistent with this opinion.

**<u>Reversed</u>**.