In re Carlton Dana PRATT and
Christie Ann Pratt,
Debtors.

Carlton Dana Pratt and Christie
Ann Pratt, Plaintiffs,

v.

General Motors Acceptance
Corporation, Defendant.

Bankruptcy No. 98–20291.
Adversary No. 04–02007.

United States Bankruptcy Court,
D. Maine.

April 15, 2005.

James Molleur, Esq., Saco, ME, for Plaintiff.

F. Bruce Sleeper, Esq., Jensen, Baird, Gardner & Henry, Portland, ME, for Defendant.

### Memorandum of Decision

JAMES B. HAINES, JR., Chief Judge.

Before me on a stipulated record is Carlton and Christie Ann Pratt's complaint seeking sanctions against General Motors Acceptance Corporation (GMAC) for asserted violations of the Bankruptcy Code's discharge injunction. Sure enough, GMAC's post-discharge refusal to release its security interest in the Pratts' car, coupled with its refusal to repossess the vehicle, has hobbled the Pratts' efforts to be shed of their car-related financial frustrations. But, in this Chapter 7 case converted from Chapter 13, GMAC's conduct does not violate § 524(a)'s[1] injunctive provisions.

### *Background*

Carlton Pratt purchased a 1994 Chevrolet Cavalier from Frank Galos Chevrolet, Inc., in Saco, Maine, on March 2, 1994. He financed the purchase through a GMAC program and GMAC came to hold the note, secured by a perfected, purchase money lien.

Carlton and Christie filed a Chapter 13 petition on March 4, 1998, scheduling the Cavalier with a value of $4,900.00 and GMAC's claim at $3,227.37. GMAC filed its secured proof of claim in the amount of $3,291.35, which was allowed with 5.5% interest. In the course of the Chapter 13 case, GMAC received distributions totaling $1,083.62 from the Chapter 13 trustee.

---

**1.** Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101 *et seq.*

The Pratts converted their case to Chapter 7 on May 10, 1999, and, pursuant to § 521(2)(A), stated their intention to surrender the Cavalier. Factoring in interest, and deducting the Chapter 13 distribution, the amount remaining on GMAC's secured claim at conversion was $2,620.72. On June 29, 1999, GMAC received relief from stay to realize upon its lien, and on July 1, 1999, GMAC dispatched to the Pratts a "Notice of Right to Cure Default." On July 27, 1999, GMAC wrote off the remaining contract balance, which it figured at $2,510.83, on its books.[2] On August 17, 1999, the Pratts received their discharge.

GMAC made no attempt to enforce its security interest in the Cavalier. It calculated that the expense of repossession and sale exceeded what it would realize by the effort. On September 20, 1999, the Pratts asked GMAC to take possession of the car, but GMAC refused. On October 1, 1999, the Pratts' attorney requested that GMAC remove the Cavalier from their rented residence.[3] Again, GMAC refused, informing him that it had determined not to repossess the car.

Ten months later, someone representing herself to be Carlton's sister called GMAC, claiming she had purchased the car. She asked that GMAC release its lien. GMAC stated it would not do so until it was fully paid. The next day, the Pratts' counsel again wrote GMAC asking for a lien release—and again was refused.

In December 2003 the Pratts called GMAC asking that the title be cleared so they could dispose of the car. GMAC replied that it would release its lien only upon payment of the loan. A follow-up call from the Pratts' attorney confirmed GMAC's position.

On December 17, 2003, the Pratts had the Cavalier towed to the Frank Galos dealership and left it there. The same day, the Pratts' counsel again demanded that GMAC release its lien. All the while, GMAC maintained its position that it would not voluntarily release its lien without payment of all amounts owed it on the car loan.[4]

In addition to the foregoing factual stipulations, the parties have agreed on other, broader points:

Although GMAC has no written policy on the point, it does not ordinarily repossess a vehicle that a bankruptcy debtor intends to surrender if the cost of repossession and disposal exceed the vehicle's value.

After entry of the discharge order, "GMAC never initiated a contact with the Pratts or any other person or entity seeking to collect any amounts owing to GMAC as a personal liability of the Pratts."

After entry of the discharge order, the only activities GMAC took with regard to the Cavalier or the loan was "to re-

---

2. The parties' stipulation includes an exhibit detailing the account history and balance. For our purposes, the difference between the allowed secured claim, as reduced by plan distributions at conversion, and the contract balance later written off by GMAC is immaterial.

3. On several occasions the Pratts' landlord demanded that they remove the Cavalier from his property. Although it is not essential to my holding, I can readily infer from the stipu-

lated facts that the car was inoperable, or practically so, at the time the Pratts converted their case to Chapter 7.

4. The dealership threatened to tow the Cavalier back to the Pratts' residence, or to their attorney's house. The dealer and GMAC had their own differences about the car's disposition, storage charges, and other matters. Those issues are not germane to the Pratts' complaint.

ceive and respond to contacts initiated by others, including the Pratts...."

"At no time after the issuance of [the] discharge did GMAC ever state that the Pratts owed to GMAC or to anyone else money outstanding under the terms of the [car loan], except to the extent that" it stated that "it would release its lien" only "upon payment in full of all such amounts."

### Discussion

The Pratts contend that GMAC's post-discharge actions amount to attempts to collect the outstanding contract balance from them personally. GMAC urges that its post-discharge activities constituted only permissible, continuing reliance on its enduring lien. We will begin by considering the force and content of the discharge injunction, how it is enforced, and then assess GMAC's conduct.

### I. Discharge and the Discharge Injunction

The Pratts' Chapter 7 discharge operated to discharge them "from all debts that arose before the date of the order for relief." 11 U.S.C. § 727(b). It continues to operate "as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2).

Discharge carries with it an injunction against debt collection efforts. The injunction imposed by Code § 524(a)(2) is intentionally broad in scope and is intended to preclude virtually all actions by a creditor to collect personally from the debtor. The House and Senate Reports made clear this intention:

> The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph has been expanded over a comparable provision in [the] Bankruptcy Act ... to cover any act to collect, such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, threats of repossession, and the like. The change is ... intended to ensure that once a debt is discharged, the debtor will not be pressured in any way to repay it.

3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* (hereinafter "*Norton*") § 48:3, at 48–7 (1997) (footnote deleted); *see Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444 (1st Cir.2000) ("Generally, a discharge in bankruptcy relieves a debtor from all pre-petition debt, and § 524(a) permanently enjoins creditor actions to collect discharged debt."); *Doughty v. Holt (In re Doughty)*, 195 B.R. 1, 4 (Bankr.D.Me.1996).

The bankruptcy court can invoke § 105(a)[5] to enforce § 524(a)'s discharge injunction. *Bessette*, 230 F.3d at 445. Redress can take the form of damages, attorney fees, and, in appropriate cases, punitive damages. *Id.* Discharge injunction enforcement proceedings are in the nature of civil contempt. *Id.*

---

5. Section 105(a) provides:
 The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

## A. Burden of Proof

■ GMAC argues that a finding of civil contempt must rest on clear and convincing evidence. Generally speaking, that proposition is true. *AccuSoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir.2001); *Gemco Latinoamerica, Inc., v. Seiko Time Corp.*, 61 F.3d 94 (1st Cir.1995). The Pratts posit that violations of the statutory discharge injunction stand on a different footing. In their view, enforcing the discharge injunction via § 105 is like enforcement of similar Code provisions—where clear and convincing evidence is not required. *See, e.g.,* § 362(h); *Fleet Mortgage Group, Inc. v. Kaneb (In re Kaneb)*, 196 F.3d 265 (1st Cir.1999) (discussing willful violation of the automatic stay and determining that relief may be obtained if the offending party knew of the stay and intended the action that violated it).

The Pratts' position has much to recommend it, given the statute's clarity, and the essential role discharge plays in the Code's "fresh start" objective. *Bessette* recognized that § 524(a) is enforced by way of § 105(a), rather than directly, in proceedings styled "civil contempt." The cases cited by the *Bessette* court do not discuss burden of proof directly, although, on balance, they adopt the same "willfulness" elements as the First Circuit recognized in *Kaneb*. Those elements (knowledge of the order, willful action that violates the order) do not fit with a "clear and convincing" burden of proof. *See Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1389–90 (11th Cir.1996) (citation for contempt under the court's inherent powers made only upon a showing of "bad faith," whereas liability for contempt of § 524 injunction under § 105 lies if defendant *willfully* violated § 524); *In re Elias*, 98 B.R. 332, 337 (N.D.Ill.1989) ("It is enough if the order violated is specific and definite, and that the offending party has knowledge of it."); *but see In re Arnold*, 206 B.R. 560, 568 (Bankr.N.D.Ala.1997) (sanctions for violation of discharge injunction can issue through court's inherent powers on showing of bad faith or "malevolent intent"); *cf. In re Rosteck*, 899 F.2d 694, 697 (7th Cir. 1990) (affirming award of sanctions without mention of § 105, and holding that creditor waived argument that proof of willfulness was required). Moreover, the First Circuit has expressly recognized that enforcement of the statutory discharge injunction, as compared to enforcing an injunction "individually crafted" by a judge, is a straightforward exercise. *Bessette*, 230 F.3d at 446 (enforcing the discharge injunction does not call for consideration of the judge's "insights and thought processes" as would be pertinent to enforcing a custom-made injunction).

■ It would seem that proving a violation of the discharge injunction, actionable by way of a § 105(a) contempt proceeding, should only require proof by a preponderance of the evidence that the offending creditor knew of the bankruptcy discharge and took willful action in violation of the discharge injunction. Section 524(a)'s injunction is as critical to a deserving debtor's fresh start as the Code's automatic stay is to providing immediate relief to the financially distressed debtor. *See Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 975 (1st Cir.1997). Its enforcement should be no more burdensome.[6] However, finally resolving the point today is unnecessary. As set out below, the record demonstrates that GMAC did not violate the injunction *as a matter of law.*

---

**6.** Creditors will seldom be unaware of the discharge injunction or its content. *See* Fed. R. Bankr.P. 4004(g). Under § 105(a) the court can craft tailored relief appropriate to effect a just result on the facts of each case brought before it.

### B. Lien Enforcement

 Creditors who hold valid liens not avoided in the bankruptcy case are free to enforce those liens against their collateral after the debtor's personal liability has been discharged. "Any lien not invalidated or avoided survives the debtor's discharge." 3 *Norton* § 48:4, at 48–11. Sections 524(a)(1) and 524(a)(2) specifically enjoin only activities seeking to enforce a debtor's *personal* liability. A post-discharge action to enforce a surviving lien is an *in rem* action. It must proceed without recourse against the debtor for any deficiency. *Id.; see Arruda v. Sears, Roebuck & Co.,* 310 F.3d 13, 22 (1st Cir. 2002) ("[T]hus, the lienholder's right to repossess is nothing more than a right to an equitable remedy for the debtor's default. The fact that this surviving right is *in rem* only limits the recourse that the lienholder can take to repossession or obtaining an amount of money reflecting the value of the collateral.") (citation omitted); *see also Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

 Creditors holding valid liens that have "passed through" bankruptcy generally run afoul of the discharge injunction only if they enforce them in ways meant to coerce a debtor's payment of a discharged personal obligation. This occurs most often when the creditor threatens to repossess collateral that the debtor wants or needs to retain, but, without obtaining a proper reaffirmation agreement, promises to forbear so long as the debtor continues to make payments (which encompass the discharged personal liability):

> Prior to adoption of the Code, many debtors in liquidation cases were in fact denied the benefits of discharge due to threatened repossessions of property by secured creditors who used the leverage of their liens to collect the prior debt. Congress found these creditor actions to be contrary to bankruptcy policy. The obvious intention of the Code is to eliminate the problem by expanding the terms of the discharge injunction, providing a statutory right to redeem property from a lien, and providing substantive and procedural restrictions on reaffirmation agreements. Nevertheless, circumstances may arise in which a debtor exempts property subject to a lien but is unable to redeem the property with cash or a reaffirmation agreement. In such circumstances, a creditor may attempt to use the threat of foreclosure as leverage to obtain repayment by the debtor. As in the case of conditional refusals to perform, while repossession does not violate Code § 524(a), the conditional threat is an act designed to collect the debt as a personal liability.

3 *Norton* § 48:4, at 48–12, –13 (footnotes omitted); *see Arruda,* 310 F.3d at 22 (creditor sending proposed agreements for installment redemption of consumer collateral to debtors post-discharge, and representing that the alternative would be repossession, did not violate discharge injunction because creditor did not attempt to impose personal liability on debtors); *but cf. Jamo v. Katahdin Fed. Credit Union (In re Jamo),* 283 F.3d 392 (1st Cir.2002) (secured creditor may condition reaffirmation of residential mortgage obligation on debtors' reaffirmation of other, discharged, unsecured obligations).

### II. You Can't Get There From Here

The twist is that the Pratts complain not about any GMAC threat to repossess their Cavalier, but about its refusal to do so, coupled with its refusal to remove its lien from the Cavalier's title. They claim that GMAC's posture stymied their fresh start, effectively operating to pressure them to

pay what was owed against the car as a personal liability, notwithstanding their bankruptcy discharge.

### A. Injunction Issues: Accommodation Not Required

The Pratts begin by referring to *Bank of Boston v. Burr (In re Burr)*, 160 F.3d 843 (1st Cir.1998). *Burr* held that § 521(2) "unambiguously requires chapter 7 debtors wishing to retain property of the estate that secures a consumer debt to elect one of the retention options specified in 11 U.S.C. § 521(2)(A), and then to perform the elected option in accordance with 11 U.S.C. § 521(2)(B)." *Burr*, 160 F.3d at 849. With a lien in place, the retention options are redemption and reaffirmation. The option for debtors who do not wish to retain the collateral is "surrender." The Pratts contend that GMAC has effectively negated the "surrender" option, leaving them with no choice but to redeem the car or reaffirm their obligation to it. This, they say, frustrates their fresh start because redemption and reaffirmation cost money and are to be available at a debtor's option, not thrust upon them by creditor action (or inaction). Their characterization of redemption and reaffirmation, the so-called "retention options" is spot on. Redemption and reaffirmation are avenues by which debtors may *if they choose* and, in reaffirmation's case, *if they can reach agreement with the secured creditor*, keep personal property they wish not to replace.[7]

To retain the Cavalier by reaffirmation (assuming GMAC would consent), the Pratts would be required to reinstate their personal liability for the full balance of the contract price. And to redeem, they would be required to tender to GMAC the full amount of its "allowed secured claim." Either option would cost them money—to retain a car they did not wish to keep. They urge that they are entitled to be shed of their obligation to GMAC, in its entirety, by freely exercising the "surrender option."

GMAC counters that, as a lienholder, it cannot be compelled to retake possession of its collateral. So far, so good. The proposition is manifest.[8] But, it also asserts that it cannot be compelled to release its lien without "full payment." With the Cavalier's abandonment and the estate's administration complete, GMAC asserts

---

7. Redemption is an "alternative form of relief" for debtors, enabling them to "retain their necessary property and avoid high replacement costs by providing them with a right of first refusal in consumer goods that might otherwise be repossessed or foreclosed upon by creditors." 3 *Norton* § 69–1, at 69–2, –3.

An individual debtor *may*, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

11 U.S.C. § 722 (emphasis added).

Reaffirmations are governed by § 524(c), which addresses an *"agreement* between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a [bankruptcy] case." 11 U.S.C. § 524(c)(emphasis added). Reaffirmation "requires a meeting of the minds." *In re Jamo*, 283 F.3d at 397.

8. GMAC holds a lien interest to secure payment. It does not own the car. The character of its interest and the processes by which it may enforce its lien are defined and regulated by statute. *See* 29–A M.R.S.A. § 701 *et seq.* (Creation and perfection of security interests in automobiles).

that its rights as a "pass through" lienholder vis-a-vis its collateral are governed exclusively by state law, citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). And under state law, GMAC may retain its lien (its *in rem* claim) until it is paid the full amount owed it. *See* 11 M.R.S.A. §§ 9–404, 9–505.[9]

■ Of course, *Butner's* rule is not absolute. Its deferral to state law is qualified importantly: state law defines the parties' property rights *unless* some federal interest *requires* a different result. Moreover, *Butner* is usually invoked to address the rights parties bring into the bankruptcy case. Noone would pretend that those rights remain unaltered by, say, the bankruptcy discharge. Here, GMAC's stance ("We don't want the car; we won't release our lien.") rendered simple surrender of the Cavalier a practical impossibility.[10] The Pratts were stuck with a vehicle they did not want. They could not transfer ownership,[11] or even expect to "junk"

the car,[12] without clear title. But GMAC asserts it did nothing to press the Pratts personally for payment, that it has merely "responded to inquiries," contrasting its behavior with that of creditors who have violated the discharge injunction by actively seeking payment of discharged debts. *E.g., In re Miller*, 247 B.R. 224 (Bankr. E.D.Mich.2000) (landlord's attempt to collect postpetition rental payments pursuant to rejected lease violated discharge injunction); *In re Andrus*, 184 B.R. 311 (Bankr. N.D.Ill.1995) (creditor's placement of signs on lawn regarding debtor's unpaid debt and bankruptcy filing found to be attempts to collect discharged debt, and as such violated discharge injunction); *Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834, 843–44 (Bankr.W.D.La.1995) (failing to halt automatic deduction from employee's wages for payment of discharged debt violates discharge injunction).

GMAC did not violate the discharge injunction by standing on its lien rights, because those rights do not impinge on the Pratts' personal discharge. Its refusal to clear the title without payment enforced its *in rem* rights only. If GMAC were to tender the Pratts a reaffirmation agreement, it could permissibly seek their con-

9. The cited sections of Maine's version of the Uniform Commercial Code's Article 9 were in effect when Carlton purchased the Cavalier. They were repealed July 1, 2001, and replaced by 11 M.R.S.A. §§ 9–1513, 9–1623(2), effective that same date.

10. GMAC urges that "surrender" under § 521 means surrender to the bankruptcy estate, not to the secured creditor. *See In re Claflin*, 249 B.R. 840, 849 n. 6 (1st Cir. BAP 2000) (discussing surrender option); *cf* § 1325(a)(5)(C) (surrender of collateral to secured creditor is satisfactory treatment of secured claim for Chapter 13 plan confirmation). To the extent it makes the point to argue that it cannot be compelled to retake possession of its collater-

al, the point is made. For other purposes, the argument is inapposite.

11. The circumstances and stipulated facts make it plain that the phone call to GMAC, purportedly from Carlton's sister who supposedly had "purchased" the car, was a ruse, a failed attempt to convince GMAC to release its lien.

12. Under Maine law, a junkyard is a "recycler," 29–A M.R.S.A. § 1101 *et seq.*, and, if it "displays, sells, exchanges, offers to negotiate, negotiates or advertises the sale of rebuilt or salvage vehicles," it is also a "dealer." 29–A M.R.S.A. § 1101(3). With an unreleased security interest encumbering the title, a recycler/dealer cannot resell the car.

sent to pay both the *secured and unsecured* portions of its claim. It did not take even that small step. It merely responded to inquiries by stating it would release its lien upon payment of what was owed it. GMAC did not accommodate the Pratts, but it did not violate the discharge injunction.

## B. Redemption Detour: A Dead End

The parties arguments raised redemption as a remedy the Pratts might have invoked while they still possessed the car. However, the requirements for redemption in a post-conversion Chapter 7 case dictate that GMAC's secured claim, and thus its payment entitlement for redemption, remained pegged to its Chapter 13 secured claim. In other circumstances, however, redemption might have solved the Pratts' conundrum.

*In re Groth*, 269 B.R. 766 (Bankr. S.D.Ohio 2001), exemplifies how redemption could serve in a straight Chapter 7 scenario. In *Groth*, the debtor declared his intention to surrender a motorboat. The boat had been sitting in his yard for years and he considered it valueless. The secured creditor claimed the boat was worth $2,000, but it refused to repossess it, or even to receive it at its repossession facility. Neither would it release its lien, asserting that the debtor must go to state court and obtain a "salvage title," a step that would require him to pay it the boat's salvage value. *Groth*, 269 B.R. at 767. The bankruptcy court held that the debtor could redeem the boat for a dollar, thus clearing the way for him to dispose of it. *Id.* at 768. The *Groth* court commented:

> [A] debtor in a chapter 7 case, as part of his fresh economic start, should be permitted to surrender collateral he does not intend to keep. If the secured creditor determines that its collateral is worth less than the cost of taking it into its possession, the creditor must waive the effect of its lien so that the debtor is able to dispose of the collateral.
>
> Section 722 may not have been enacted specifically as a process by which the payment of a nominal sum can accomplish that result. Such a proposal, however, is consistent with the legislative intent to provide resolution of the status of secured consumer debt in a chapter 7 case as to property the trustee in bankruptcy does not intend to administer. If surrender is impossible, then a debtor may purchase the creditor's interest by nominal payment under the redemption procedure.

*Id.* at 767–68.

Given the Pratts' case history, the nominal sum redemption alternative, a la *Groth*, could not apply. Redemption provides a debtor the ability to redeem collateral from a secured creditor's lien by paying the lienor's "allowed secured claim." In a Chapter 7 case that claim would be set at the collateral's value (determined at the time redemption is sought). *See* 3 *Norton* § 69:7, at 235 (Supp.2004) ("Valuation should normally occur at the later of either the filing of the request by the debtor to establish a redemption amount required, or at the date of the redemption proceeding if the request is contested.") (footnote omitted). In a Chapter 7 that has been converted from Chapter 13, however, the "allowed secured claim" is set by the provisions of § 348:

> (f)(1) Except as provided in paragraph (2), when a case under chapter 13 of this title is converted to a case under another chapter under this title—
>
> * * * * * *
>
> (B) valuations of property and of allowed secured claims in the chapter 13 case shall apply in the converted case,

with allowed secured claims reduced to the extent that they have been paid in accordance with the chapter 13 plan. 11 U.S.C. § 348(f)(1)(B).[13] *See also* 3 *Norton* § 69:9, at 239 (Supp.2004). GMAC's Chapter 13 secured claim, less plan distributions, amounted to $2,620.72. Thus, without GMAC's consent to accept a lesser sum, a court-ordered redemption would not have assisted the Pratts.[14]

### III. The End of the Road?

The Pratts' complaint seeks only damages for violation of the discharge injunction. Since the Cavalier no longer burdens them, they have not sought an order compelling GMAC to release its lien and clear the title. Were they to do so, I would have to consider carefully whether, absent some fact of considerable force, I could provide them with the relief they sought. After all, an order clearing the title would provide the same result as redemption and, as explained above, the Code determines that redemption in a converted case comes at a statutorily-set price.[15]

We can hope that circumstances like these will arise rarely. It certainly is not usual for a car, with value fixed by a Chapter 13 plan, to depreciate so precipitously that, upon conversion it is worth not only less than the secured claim as reduced by plan payments, but less than the cost of repossession and sale. Should the stars align this way again, we can only hope that enlightened self-interest and pragmatism will carry the day.

***Conclusion***

For the reasons set forth above, I conclude that GMAC has not violated the discharge injunction. Judgment in its favor will enter forthwith.

---

13. Paragraph (2), referred to in the quoted text, addresses bad faith conversions and does not apply.

14. There record is devoid of any reference to the parties' discussing compromise. GMAC steadfastly demanded "all;" the Pratts steadfastly offered "nothing."

15. I will not speculate whether, in case similar to this one in all respects except that the debtors have been unable to rid themselves of a scrap car, a secured creditor might be ordered to release its lien through an extra-redemption process, if its post-conversion conduct could be characterized as an *admission* that its collateral held no value for it.