Jeffery P. Hopkins, United States Bankruptcy Judge
Presently before the Court is WesBanco Bank, Inc.'s ("WesBanco") Objection to Confirmation of Second Amended Plan (the "Objection") (Doc. 58). On April 20, 2018, this Court sustained WesBanco's objection to Thomas R. and Virginia F. Sparks's (the "Debtors") First Amended Plan (Doc. 55), based primarily on the fact that the First Amended Plan did not satisfy the equal monthly payments to secured creditors requirement of 11 U.S.C. § 1325(a)(5)(B)(iii)(I). The First Amended Plan called for the Debtors to make monthly payments of $1,250 to the Chapter 13 trustee for the first twelve months. This Court determined that, even using the Debtors' own calculations, the First Amended Plan would result in a net monthly deficit to WesBanco of at least $1,055.50. (Doc. 55, p. 3 n. 2). This Court gave the Debtors leave to file an amended plan within 21 days thereafter.
On May 14, 2018, the Debtors filed a Second Amended Plan (the "Plan") and attached amended Schedules I and J (the "Amended Schedules"). (Doc. 57). Under the Plan, the Debtors shall make monthly *188 payments of $3,100. The Amended Schedules purport to show monthly net income for the Debtors of $3,108.23. (Doc. 57-1, Sch. J, ¶ 23c). This is despite the Debtors' previously filed schedules showing monthly net income of only $1,256.62. (Doc. 1, Sch. J, ¶ 23c; Doc. 28, Sch. J, ¶ 23c). The income and expenses listed on the Amended Schedules do not differ drastically from those previously filed on the docket, with one notable exception: The rental or home ownership expense has decreased from $2,196.24 to $0, which accounts for the purported increase in the Debtors' net income on the Amended Schedules. See Doc. 1, Sch. J, ¶ 4 and Doc. 28, Sch. J, ¶ 4; contra Doc. 57-1, Sch. J, ¶ 4.
On May 23, 2018, WesBanco filed the Objection, to which the Debtors replied on June 25, 2018 (Doc. 59). Subsequent related filings included WesBanco's Response to the Debtors' Reply (Doc. 60), Chapter 13 Trustee Margaret A. Burks's (the "Trustee") Reply to all parties (Doc. 61), the Debtors' Response to the Trustee's Reply (Doc. 62), and finally the Trustee's Reply to the Debtors' Response (Doc. 63).
SUMMARY OF THE ARGUMENTS
The Court begins from the assumption that the parties are familiar with the facts, and specifically incorporates the Summary of Facts as found by this Court in its prior Order Sustaining Objection to Confirmation. (Doc. 55, p. 2).[1] The Debtors reside at 4811 Beaver Court, Hamilton, Ohio (the "Property"). They contend that WesBanco is the holder of a lien against the Property only secured in the amount of $138,330, leaving the remainder of its claim unsecured. (Doc. 59, p. 5). By contrast, WesBanco contends its lien is secured in the full amount of $186,994.91. (Doc. 58, p. 3). Based upon their calculation, the Debtors believe they would be able to pay off the secured portion of WesBanco's debt, after bifurcation pursuant 11 U.S.C. § 506(a), over the course of the Plan by having the Trustee disperse 60 equal monthly installment payments in the amount of $2,305.50 each for a total of $138,330. (Doc. 57, ¶ 5.1.2; Doc. 59, p. 5).
Central to the Plan is the proviso the Debtors will receive a lump sum payment from their son in the amount of $16,650 (Doc. 57, ¶ 13), which will allow them "to catch up their plan payment retroactively." (Doc. 59, p. 5). The Debtors' counsel affirmatively states that these funds are presently available, having already been deposited into his trust account. Id.
The Debtors contend the Property is only worth $180,000 and have submitted an appraisal in support. (Doc. 26). WesBanco counters that the Debtors' valuation of the Property is incorrect, preferring an appraisal valuation of $240,000. (Doc. 38). A hearing was held on December 20, 2017, at which time the parties presented evidence in favor of their competing appraisals. WesBanco offers that if their appraisal is correct, then there is more than sufficient equity in the Property to cover the entirety of their secured claim, thereby making their claim ineligible for bifurcation under 11 U.S.C. § 506(a).
Moreover, WesBanco asserts that the Debtors are attempting to use creative math to reach a result that is impermissible under the law. In order to arrive at a secured claim in favor of WesBanco of $138,330, the Debtors are subtracting two liens from their claimed value of the Property. These liens are allegedly held by Fifth Third Bank, one for $15,254.51 and a *189 second for $26,415.25 (the "Fifth Third Liens"). (Doc. 62, p. 2). The parties agree the Fifth Third Liens are prior in right to WesBanco's claim. However, the Debtors' also concede that they have paid off the lesser of the Fifth Third Liens post-petition. Id. at 1. WesBanco notes, correctly, that if the lien that has been satisfied is discounted, the remaining equity, even assuming the Debtors' appraisal is accurate, would make the necessary monthly payment under 11 U.S.C. § 1325(a)(5)(B)(iii)(I), after bifurcation, unfeasible. (Doc. 58, p. 5). The Court agrees.
For the reasons that follow, WesBanco's Objection is SUSTAINED .
LAW & ANALYSIS
Section 1325(a)(5)(B)(iii)(I) of the Bankruptcy Code governs how Chapter 13 debtors must provide for payments on a secured claim absent the consent of the holder of the claim. Payments must be made in equal monthly installments sufficient to cover the security interest of the secured party. The Plan does not comply with this requirement.
I. WesBanco's appraisal is more credible, thus WesBanco's security interest is fully secured.
The competing valuations
The Debtors assert that they may bifurcate WesBanco's claim into a secured and an unsecured portion-as defined by 11 U.S.C. § 506(a) -and the unsecured portion may then be crammed down pursuant to 11 U.S.C. § 1322(c)(2).
This argument is, of course, predicated on WesBanco's lien actually being undersecured. In support of this assertion, the Debtors rely on the appraisal and testimony of licensed appraiser Deborah Turner. The Debtors' appraisal values the Property at $180,000 using a sales comparison approach. Ms. Turner's sales comparison approach selected three sales allegedly comparable to the Property. After selecting the three sales, she adjusted the price of each to account for the differences between it and the Property.
Sale # 1 is located 2.7 miles from the Property; it sold for $233,900. She reduced Sale # 1 by 1.3% to adjust for its superior garage, resulting in an adjusted value of $230,900. Sale # 2 is located 4 miles from the Property; it sold for $193,000. She reduced Sale # 2 by 2.1% to adjust for its superior basement, resulting in an adjusted value of $189,000. Sale # 3 is located 3 miles from the Property; it sold for $219,000. She reduced Sale # 3 by 2.7% to adjust for its superior basement, resulting in an adjusted value of $213,900. See Doc. 26.
Although the average value of the comparable properties after adjustments is $211,266.67, Ms. Turner valued the Property at $180,000. She testified that she made this reduction to account for the Property's condition and the cost of the necessary repairs. Notably, however, Ms. Turner made no adjustment for location despite the fact that all comparable residences she used were situated in another neighborhood 2.7 to 4.0 miles away. She testified on cross-examination that she selected residences located outside the Property's neighborhood because "[comparable sales] were not available" within the Property's neighborhood-a claim that WesBanco's appraiser Steven J. Papin demonstrated to be untrue, infra .
In addition to Ms. Turner, the Debtors also presented testimony and estimates for multiple deferred maintenance projects they claim are required on their home. The Court heard testimony from Steve Purdon, a representative of The Basement Doctor, regarding the condition of the Debtors' basement and his opinion as to the work *190 necessary to restore it. The Court also admitted Debtors' exhibits 2, 4, and 6 which contained repair estimates from The Basement Doctor, LeafGuard of Cincinnati, and Sam the Concrete Man.[2]
By contrast, WesBanco argues that the Debtors cannot cramdown their claim pursuant to § 1322(c)(2) because WesBanco's lien is oversecured. In support, WesBanco relies on the appraisal and testimony of certified appraiser Steven J. Papin. He valued the Property at $240,000 by using the sales comparison approach. Mr. Papin selected four sales allegedly comparable to the Property that were in the same subdivision. After selecting the four sales, he adjusted the price of each accounting for the difference between it and the Property.
Sale # 1 is located 0.2 miles from the Property; it sold for $260,000. Mr. Papin reduced Sale # 1 by 6.2%, resulting in an adjusted value of $243,760. Sale # 2 is located 0.32 miles from the Property; it sold for $264,000. He reduced Sale # 2 by 6.3%, resulting in an adjusted value of $247,360. Sale # 3 is located 0.16 miles from the Property; it sold for $238,000. Mr. Papin increased Sale # 3 by 3.4%, resulting in an adjusted value of $245,990. Sale # 4 is located 0.35 miles from the Property; it sold for $246,500. He reduced Sale # 4 by 3.5%, resulting in an adjusted value of $237,960. See Doc. 38. The average adjusted value of the four comparable properties is $243,767.50.
Adjustments based on location were not necessary because all four comparables are located in the same development as the Property. See Doc. 38. Mr. Papin did, however, adjust for differences in factors such as sales or financing concessions, date and time of sale, condition, above grade room count and gross living area, basement and finished rooms below grade, and porch/patio/deck. Notably, his appraisal did not include value for the Property's basement owing to damage. Doc. 38-1, p. 4. However, Mr. Papin testified that his appraisal accounted for deferred maintenance, including the necessary repairs to the basement.
In other words, while Ms. Turner purported to add value to the Property for its basement, Mr. Papin did not because of the amount of damage to it. Simultaneously, he deducted value from the Property because of that damage which needed to be fixed. Functionally, Mr. Papin treated the basement as a double-negative for his valuation. Even so, he still arrived at a substantially higher Property value. Mr. Papin stated that a $240,000 valuation was justified because of the strong seller's market in the Property's highly-desirable area. In sum, Mr. Papin concluded that buyers would be willing to pay $240,000 for the Property despite knowing that expensive repairs are necessary.
At the hearing, Mr. Papin also testified that he had a number of accuracy concerns with Ms. Turner's appraisal. Specifically, he noted that Ms. Turner's appraisal only adjusted for basement finish level and garage space and that portions of the appraisal were left blank. He also stated that she incorrectly listed the living area in two of the three comparables she used. Additionally, when questioned about Ms. Turner's comparable properties, Mr. Papin stated that when an appraisal shows comparables from outside the subject neighborhood even though similar properties exist within the same neighborhood, it is an *191 indication that the appraiser began with a conclusion of the value in mind and found data to support that conclusion. Simply stated, according to Mr. Papin, "It is very unorthodox for a credentialed appraiser to go four miles away when you have an active market in your subject's subdivision."
The Property is worth $240,000 and WesBanco's lien is oversecured
Upon careful consideration of the appraisers' testimonies and their respective appraisals, the Court finds the Property value is $240,000. It is clear from the record that Mr. Papin possessed superior credentials, training, and knowledge to that of Ms. Turner. In making its finding, the Court applied substantially more weight to Mr. Papin's appraisal and testimony. The Court is troubled by Ms. Turner's comparable sales selections, which were all located outside of the Property's neighborhood, given proximity of the comparables Mr. Papin used located within the neighborhood. The Court is convinced that the sales Ms. Turner chose were not selected with complete impartiality toward the Property's overall value in mind.
The Court is also troubled by the errors contained in Ms. Turner's appraisal, such as mislabeling of the living area in two of her three comparable sales. Such errors force the Court to question, and subsequently discount, the overall accuracy of her appraisal. Ultimately, the Court concludes that Mr. Papin's appraisal is the more accurate estimate of the Property's value. Therefore, the Court finds the Property's value is $240,000.
Given that value, WesBanco's lien cannot be bifurcated pursuant to 11 U.S.C. § 506(a). If both of the Fifth Third Liens, totaling $41,669.76, are subtracted from the Property value, a balance of $198,330.24 in equity remains. This is more than sufficient to fully secure WesBanco's claim of $186,994.91. As such, the Plan payments need to be able to cover the entirety of WesBanco's claim. Pursuant to 11 U.S.C. § 1325(a)(5)(B)(iii)(I), this would require equal monthly installment payments of $3,116.59 for 60 months. The Plan only offers to pay the Trustee $3,100[3] per month, well short of the payments necessary to cover WesBanco's claim and those of the other claim holders provided for under the Plan.
II. The Debtors may not artificially impair their equity by relying upon a released lien.
The Debtors' Creative Math
Even if this Court were inclined to accept the Debtors' valuation of the Property, it cannot countenance the method used by the Debtors in their efforts to show the Plan is feasible. This Court's prior order sustaining WesBanco's objection to confirmation of the First Amended Plan indicated that the Plan must provide for payments of $2,305.50 per month to WesBanco. To the Debtors' credit, they have developed a creative means for attempting *192 to do so. However, Fifth Third Bank had not released either of the Fifth Third Liens at the time this Court issued its previous decision. Since then, one of the Fifth Third Liens (the lesser valued $15,254.51 lien) has been fully paid and released. (Doc. 62, ¶ 2). It is the payoff of this lien which has enabled the Debtors to increase their monthly net income on Schedule J from $1,256.62 to $3,108.23. See supra pp. 187-88.
The Debtors presume they can count a paid-off mortgage against the equity in their residence for the purposes of limiting a security interest by another creditor. The Debtors, however, have offered no statutory or legal authority to support such a novel approach. This Court can find none either. Absent this, the Court has only its limited equitable powers upon which to rely to reach the result advanced by the Debtors.
"[T]he proceedings of bankruptcy courts are inherently proceedings in equity...." Katchen v. Landy , 382 U.S. 323, 336, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). The bankruptcy court's equitable authority is codified in statute at 11 U.S.C. § 105(a) which states, in pertinent part, "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." However, "the power granted to the bankruptcy courts under section 105 is not boundless and should not be employed as a panacea for all ills confronted in the bankruptcy case." 2 Collier on Bankruptcy ¶ 105.01[2] (16th ed. 2018). "The authority bestowed thereunder may be invoked only if, and to the extent that , the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." Jamo v. Katahdin Fed. Credit Union (In re Jamo) , 283 F.3d 392, 403 (1st Cir. 2002) (citing Norwest Bank Worthington v. Ahlers , 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ) (emphasis added). The Debtors have failed to identify any right upon which the course of action requested would be warranted.
Under the circumstances, this Court finds that principles of equity and fairness militate against invoking its limited equitable powers under § 105(a). The Debtors should not and, indeed, may not use a debt they no longer pay as a shield against paying an extant creditor, and simultaneously use that released debt as a sword to artificially slash WesBanco's security interest in the Property.
Though not squarely on point with the facts in the case at bar, the Court finds the Supreme Court's reasoning in Ransom v. FIA Card Services, N.A. , 562 U.S. 61, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011), persuasive authority for reaching this result. In Ransom , the Supreme Court resolved the split among the appellate courts over whether a debtor who does not make loan or lease payments on his car may claim the deduction set forth in the means test for vehicle ownership costs. Ransom denied such a deduction is applicable if a debtor did not owe such a loan or lease, albeit on the date the petition was filed. Id. at 68, 131 S.Ct. 716. In other words, the Court refused to allow a debtor to claim a phantom car ownership expense under the means test.
We think the Supreme Court's reasoning in Ransom applies with equal force to the facts in this case. This Court will not allow the Debtors to count a debt that does not exist against the equity in the Property-a result which we believe would be at odds with Ransom and which would be inequitable if allowed to stand under the Plan as proposed.
Because the debt on one of the Fifth Third Liens (the lesser valued $15,254.51 *193 lien) has been fully satisfied and released, this Court rejects the Debtors' attempt to include that lien against the equity in the Property. This means, of course, that even if the Court assumes the Debtors' appraisal is correct, there is still $153,584.75[4] in equity to which WesBanco's claim attaches pursuant to 11 U.S.C. § 506(a).
The Necessary Plan Payments
Thus, even under the Debtors' valuation of the Property, the Plan would have to allow, at minimum, for monthly payments to WesBanco alone in the amount of $2,559.75. Currently, however, the Plan calls for 60 monthly payments to the Trustee in the amount of $3,100. In addition to WesBanco's claim, the Trustee must be able to pay from this amount (1) Wells Fargo $311 per month on a car payment (Doc. 57, ¶ 5.1.4); (2) Debtors' counsel $200 per month (Doc. 57, ¶ 5.1.7); and (3) the Trustee's own 5.4% fee amounting to $167.40 monthly. This comes to a total of $3,238.15 and does not even include the 1% dividend to unsecured creditors. (Doc. 57, ¶ 2.2). Put simply, the numbers as proposed by the Debtors are unworkable and the Plan is not confirmable.
CONCLUSION
Because this Court has found the applicable value of the Property is $240,000, WesBanco's lien is oversecured and cannot be bifurcated pursuant to 11 U.S.C. § 506(a). Any attempt to cramdown this debt is impermissible under the Bankruptcy Code. The Plan does not provide enough funding to pay WesBanco's lien in its entirety and, therefore, must be denied confirmation. Additionally, even if this Court accepted the Debtors' valuation of the Property and allowed WesBanco's lien to be bifurcated, there is insufficient funding in the Plan to pay WesBanco's security interest.
Based on the foregoing, WesBanco's Objection to Confirmation of Second Amended Plan (Doc. 58) is hereby SUSTAINED .
IT IS SO ORDERED

The Court hereby amends its previous order and corrects the typographical error contained in the Summary of Facts. The record shall reflect that the promissory note held by WesBanco became due on February 16, 2017, as opposed 2007.

The exhibits reflect the following maintenance estimates:
The Basement Doctor: $18,538.00 (Exhibit 2)
LeafGuard of Cincinnati: $22,969.84 (Exhibit 4)
Sam the Concrete Man: $15,750.00 (Exhibit. 6)

For the sake of this analysis, the Court assumes the availability of the proposed lump sum payment of $16,650 from the Debtors' son which would theoretically allow them to "catch up" on their monthly payments; the Court explicitly reserves judgment on the issues surrounding that payment should the Debtors file a third amended plan.
It should also be noted that the Debtors failed to check the box in section 1 of the Plan to note that it contains nonstandard provisions in Paragraph 13. As the Plan instructions state, "If an item is not checked, the provisions will be ineffective if set out later in the Plan." As such, this Court would not be able to give effect to the nonstandard provision. Thus, the Plan would be unconfirmable anyway as the lump sum payment is necessary to effectuate the financial terms of the Plan.

$180,000 - $26,415.25 = $153,584.75