Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| BANCO POPULAR DE PUERTO RICO<br><br>recurridos<br><br>V.<br><br>ELLIOT ELIJA TORRES MARTÍNEZ T/C/C; ELLIOT TORRES MARTÍNEZ T/C/C ELLIOT ELIJU TORRES MARTÍNEZ T/C/C ELLIOT E. TORRES T/C/C ELLIOT E. TORRES MARTÍNEZ<br><br>RECURRIDOS | TA2025CE00067 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Civil Núm.: CG2022CV00484<br><br>Sobre: Ejecución de Hipoteca: Propiedad Residencial |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Álvarez Esnard, y la jueza Prats Palerm

**Brignoni Mártir, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de agosto de 2025.

Comparece ante nos, Elliot Elija Torres Martínez (en adelante, "el peticionario"). A los fines de solicitar nuestra intervención para que dejemos sin efecto la *"Orden"* emitida el 2 de mayo de 2025 y notificada el 5 de mayo de 2025, por el Tribunal de Primera Instancia, Sala Superior de Caguas. Mediante la referida determinación, el foro primario autorizó la ejecución de la *"Sentencia"* en rebeldía. En consecuencia, ordenó la continuación de los procesos dirigidos a la venta en pública subasta del bien inmueble objeto de litigio. Todo, dentro de un pleito civil sobre ejecución de hipoteca, promovido por el Banco Popular de Puerto Rico (en lo sucesivo, "Banco Popular").

Por los fundamentos que expondremos a continuación*,* y con la autoridad que nos concede la Regla 40 del TA, *expedimos* el auto de *certiorari* presentado. En consecuencia, revocamos la determinación recurrida y con ello decretamos la *nulidad* del gravamen hipotecario en

cuestión. Ante ello, los procesos de ejecución de hipoteca no deben seguir su curso por estar amparados en una *"Sentencia"* que concedió la ejecución de una hipoteca que no advino a la vida jurídica.

**I.**

El 18 de febrero de 2022, el Banco Popular presentó la *"Demanda"* de epígrafe. Sostuvo, que mantiene la tenencia de un pagaré hipotecario, cuyo deudor es el peticionario. Alegó, que dicho pagaré es por la suma principal de $169,569.00 y un interés anual de 6.50%. Según aseveró, como derecho de garantía, el peticionario otorgó una hipoteca voluntaria mediante la Escritura Núm. 352, suscrita el 30 de octubre de 2007. Esgrimió, que dicha hipoteca graba un bien inmueble sito en Caguas. Además, adujo que el peticionario dejó de satisfacer el pago de la deuda hipotecaria, por lo cual solicita la venta en pública subasta del inmueble objeto de litigio a través de una acción exclusivamente *in rem*. Cónsono con ello, arguyó que no presentó acción *in personam,* puesto que el peticionario obtuvo un descargo de la obligación personal en la corte de quiebras. En virtud de lo expuesto, solicitó que se declarara *Ha Lugar* la *"Demanda."*

Así las cosas, el 8 de abril de 2022, el Banco Popular solicitó que se autorizara el emplazamiento por edicto del peticionario, debido a que éste no había podido ser localizado a pesar de las diligencias realizadas. A través de la *"Orden sobre Publicación de Edicto,"* notificada el 13 de julio de 2022, el foro recurrido autorizó la solicitud de emplazamiento por edicto, presentada por el Banco Popular.

Posteriormente, el 30 de agosto de 2022, el Banco Popular presentó *"Solicitud de Anotación de Rebeldía y Sentencia."* Aseveró, que el peticionario no había presentado su alegación responsiva en el término dispuesto en el ordenamiento procesal civil. Ante ello, argumentó sobre la procedencia de la referida anotación de rebeldía y con ello la adjudicación de la reclamación a su favor.

El 9 de septiembre de 2022, el foro recurrido notificó una *"Sentencia"* en rebeldía. Mediante esta, declaró *Ha Lugar* la *"Demanda"* de epígrafe. En consecuencia, ordenó la venta en pública subasta del bien en disputa, una vez adviniera final y firme la *"Sentencia."*[1]

Tras la publicación por edicto de la *"Sentencia"* en rebeldía, el 2 de marzo de 2023, el Banco Popular presentó *"Moción de Ejecución de Sentencia,"* bajo el fundamento de que la *"Sentencia"* en rebeldía había advenido final y firme. El 13 de marzo de 2023 el foro recurrido declaró *Ha Lugar* la aludida solicitud de ejecución.

Tras anunciarse por edicto las fechas para la celebración de subasta, el 4 de marzo de 2025, el peticionario presentó *"Moción Urgente para la Paralización de Procesos de Subasta."* Mediante este escrito, cuestionó la legalidad de la constitución de hipoteca en controversia. Aseveró, que el 6 de mayo de 2009, presentó una petición de quiebra ante la Corte Federal de Quiebra, y con ello entró en vigor la paralización automática de ejecución de deudas. Sostuvo, que la aludida Escritura sobre constitución de hipoteca fue presentada el 4 de noviembre de 2011 al Registro de la Propiedad. Según esgrimió, la referida presentación fue posterior a la paralización establecida en el proceso de quiebra, por lo cual el Banco Popular actuó en violación de dicha paralización. Ante tales alegaciones, argumentó que adolece de nulidad la hipoteca objeto de litigio, puesto que se creó en contravención de la paralización automática establecida.

En atención del escrito presentado, el 5 de marzo de 2025, el foro recurrido dejó sin efecto la subasta que habría de celebrarse al siguiente día,[2] hasta que el Banco Popular presentara su posición y el tribunal adjudicara el asunto en controversia.

---

[1] Cabe señalar, que el 18 de enero de 2023, el foro recurrido notificó una nueva *"Notificación de Sentencia por Edicto,"* dado que la anterior notificación no se pudo efectuar adecuadamente.

[2] Para la propiedad objeto de litigio se celebró una primera subasta el día 26 de febrero de 2025. No obstante, ésta fue declarada desierta por no comparecer licitador alguno. Véase, *"Acta de Primera Subasta,"* presentada por el Alguacil el 17 de marzo de 2025. Entrada Núm. 39 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

Así las cosas, el 21 de abril de 2025, el Banco Popular presentó *"Oposición a Moción Urgente para la Paralización de Procesos de Subasta."* En síntesis, adujo que los planteamientos del peticionario constituyen cosa juzgada, por haber sido presentados en dos (2) ocasiones previas en la Corte Federal. Aseveró, que las acciones incoadas por el peticionario fueran desestimadas en las referidas dos (2) ocasiones. Alegó, que las aludidas desestimaciones fueron motivadas por la falta de diligencia del peticionario.

El 30 de abril de 2025, el foro recurrido notificó una *"Orden,"* mediante la cual mantuvo en vigor la paralización de la subasta. En la misma fecha, el Banco Popular presentó escrito intitulado *"Moción en Cumplimiento de Orden y Solicitud de Término para Presentar Moción Suplementaria."* En lo atinente, radicó nuevamente la *"Oposición a Moción Urgente para la Paralización de Procesos de Subasta"* junto a la documentación que, bajo su postura, fundamenta la existencia de cosas juzgada y la improcedencia de la paralización de la subasta.

Así pues, el 5 de mayo de 2025, el foro recurrido notificó la *"Orden"* que hoy nos ocupa. Mediante esta, autorizó la ejecución de la *"Sentencia"* en rebeldía. En consecuencia, dejó sin efecto la paralización de la venta de la propiedad en pública subasta.

Ante tal proceder, el 12 de mayo de 2025, el peticionario presentó *"Moción Solicitando Reconsideración."* Ésta fue declarada *No Ha Lugar* por el foro recurrido con fecha de notificación de 2 de junio de 2025.

En desacuerdo, el 1 de julio de 2025, el peticionario presentó oportunamente un recurso de *certiorari* ante este Tribunal. Mediante este, esbozó los siguientes señalamientos de error:

> Erró el Honorable Tribunal de Primera Instancia, Sala de Caguas, al autorizar la continuación del proceso de ejecución de sentencia mediante subasta.

> Erró el Honorable Tribunal de Primera Instancia, Sala de Caguas, al no declarar nula la inscripción de hipoteca en violación a la paralización automática del Código de Quiebra.

El 8 de julio de 2025, le concedimos al Banco Popular un término de diez (10) días para presentar su oposición al recurso de *certiorari.* En

cumplimiento de ello, el 17 de julio de 2025, el Banco Popular presentó *"Oposición a Expedición de Recurso de Certiorari."*

Así las cosas, el 19 de julio de 2025, el peticionario compareció nuevamente ante nos por medio de una *"Solicitud de Autorización para Presentar Réplica."* El 21 de julio de 2025, concedimos la autorización peticionada. Al día siguiente, el Banco Popular solicitó que se le autorizara presentar una dúplica luego de que el peticionario radicara su réplica.

Así pues, el 30 de julio de 2025, el peticionario presentó *"Réplica a la Oposición de la Parte Recurrida a la Expedición del Recurso de Certiorari."* En vista de ello, el 1 de agosto de 2025, le concedimos al Banco Popular un término de diez (10) días para presentar la dúplica peticionada. En cumplimiento de lo anterior, el 11 de agosto de 2025, el Banco Popular presentó *"Duplica a la Oposición de la Parte Recurrida a la Expedición de Recurso de Certiorari."*

Con el beneficio de la comparecencia de las partes litigantes, procedemos a esbozar el marco doctrinal aplicable a la cuestión litigiosa.

## II.

### A.    Recurso de *Certiorari*

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar a su discreción una decisión postsentencia de un tribunal inferior. *Rivera et al v. Arcos Dorados et al.*, 212 DPR 194, 207 (2023); *Orthopedics Prod. Of Puerto Rico, LLC v. Medshape, Inc.*, 207 DPR 994, 1004 (2021); Art. 670 del Código de Enjuiciamiento Civil de 1933, conocido como Ley de Recursos Extraordinarios, 32 LPRA sec. 3491. La característica distintiva del *certiorari* "se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos". *Íd.* Ahora bien, el ejercicio de esta discreción no es absoluto.

La Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA,* 2025 TSPR 42, pág. 62-63, 215 DPR ___ (2025), delimita los criterios para la expedición de un

auto de *certiorari.* Así pues, estas consideraciones "orientan la función del tribunal apelativo intermedio para ejercer sabiamente su facultad discrecional". *Rivera et al v. Arcos Dorados et al*, supra. La aludida regla permite que el análisis del foro apelativo intermedio no se efectúe en el vacío ni se aparte de otros parámetros al momento de considerar los asuntos planteados. *BPPR v. SLG Gómez-López*, 213 DPR 314, 337 (2023); *Rivera et al v. Arcos Dorados et al*, supra; *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 848 (2023); *800 Ponce de León v. American International*, 205 DPR 163, 176 (2020). De conformidad con lo anterior, la Regla 40, *supra*, dispone los siguientes criterios:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

B. Si la situación de hechos planteada es la más indicada para el análisis del problema.

C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Los foros revisores no debemos intervenir en las determinaciones de hechos del tribunal de instancia, "salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad o incurrió en craso abuso de discreción o en error manifiesto." *Citibank v. ACBI*, 200 DPR 724, 736 (2018). Esta norma permite que el foro primario actúe conforme a su discreción judicial, que es la facultad que tiene "para resolver de una forma u otra, o de escoger entre varios cursos de acción". Id. pág. 735; *Graciani Rodríguez v. Garage Isla Verde*, LLC, 202 DPR 117, 132 (2019). El ejercicio esta discreción "está inexorable e indefectiblemente atado al concepto de la razonabilidad". Íd.; *Pueblo v. Hernández Villanueva*, 179 DPR 872, 890 (2010). Así pues, "la

discreción es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Íd; Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016). No obstante, un tribunal incurre en abuso de discreción cuando ignora sin fundamento un hecho material, concede demasiado peso a un hecho inmaterial, y fundamenta su determinación en ese hecho irrelevante, o cuando a pesar de examinar todos los hechos del caso hace un análisis liviano y la determinación resulta irrazonable. *íd.* pág. 736. En esos casos, los foros apelativos ostentamos la facultad discrecional para expedir el recurso de *certiorari* y ejercer nuestra función revisora.

**B.      Constitución de Hipoteca**

La hipoteca debidamente constituida se convierte en un derecho real que garantiza una obligación pecuniaria. *Banco Popular de Puerto Rico v. Zorrilla Posada y otro*, 2024 TSPR 62. Al ser así, su titular puede exigir eventualmente la realización de su valor y tomar medidas para salvaguardar su derecho. *Matos Rivera v. Soler Ortiz*, 213 DPR 1044, 1061 (2024). La referida realización de valor permite al titular del derecho hipotecario recobrar su acreencia mediante la enajenación del inmueble hipotecado en los casos en que el deudor incumpla con la obligación principal en el plazo pactado. *Id.*

La hipoteca tiene ciertas características en las que resaltan su naturaleza accesoria e indivisible, su constitución registral y que solo grava bienes inmuebles, ajenos y enajenables, que permanecen en posesión del propietario. *Banco Popular de Puerto Rico v. Zorrilla Posada y otro*, supra. En lo atinente a la constitución registral, el derogado Código Civil de 1930, el cual es aplicable a los hechos contractuales ocurridos en el presente caso, establece que "es indispensable, para que la hipoteca quede válidamente constituida, que el documento en que se constituya sea inscrito en el registro de la propiedad." Art. 1774, 31 LPRA sec. 5042; véase, además, *Banco Popular de Puerto Rico v. Zorrilla Posada y otro*, supra.

La importancia de la inscripción registral se sintetiza en que a través de dicho acto la hipoteca adviene a la vida jurídica y la garantía de un crédito personal se transforma en un derecho real. *Matos Rivera v. Soler Ortiz*, supra, pág. 1062. Para que un derecho hipotecario quede debidamente constituido es indispensable la concurrencia de los siguientes requisitos: a) que la hipoteca se constituya para asegurar el cumplimiento de una obligación principal; b) que la cosa hipotecada pertenezca en propiedad a quien la hipoteca; y c) que las personas hipotecantes tengan la libre disposición de sus bienes o, en su defecto, gocen de autorización legal para el acto de constitución. Art. 1756, 31 LPRA sec. 5001; *Crespo Rodríguez v. González González,* 208 DPR 557, 573 (2022).

El efecto real de la inscripción registral también permite que el gravamen hipotecario sea oponible a terceras personas. *Crespo Rodríguez v. González González* supra, pág. 574. Si por alguna razón la hipoteca pactada no logra su inscripción registral, el acreedor hipotecario solo tendrá un crédito personal a su favor y la escritura de hipoteca constituirá prueba de un documento privado, por lo cual su validez se limitará a un negocio jurídico de naturaleza contractual, si concurren los requisitos necesarios para su perfeccionamiento. *Id,* pág. 574-575.

**C.    Paralización Automática al amparo de la Ley de Quiebras Federal y su interpretación ante controversias sobre derechos propietarios regulados por legislaciones estatales**

La presentación de una petición de quiebra conlleva la paralización automática de diversos procesos contra la parte que se acoge a los remedios provistos por El Código de Quiebras Federal. *CMI Hospital v. Depto. Salud*, 171 DPR 313, 322 (2007). Todo lo relacionado a la regulación de la paralización automática se encuentra esbozado en la sección 362 del Título 11 del Código de los Estados Unidos (11 USC sec. 362). "La paralización automática es una orden para cesar todas las gestiones de cobro, retención, embargo o ejecución de hipoteca contra una persona que ha solicitado acogerse a la protección de la ley de quiebras." *Id.* Su existencia no depende de una notificación formal, pues surte efectos

desde que se presenta la petición de quiebra y se extiende hasta que se dicta la sentencia final. *BPR v. SLG Goméz-López,* 213 DPR 314, 330 (2023); *Peerles Oil v. Hnos. Torres Pérez*, 186 DPR 239, 255 (2012); *In re Jamo,* 283 F.3d 392, 398 (1er Cir. 2002).

La Ley de Quiebras le permite al deudor establecer un plan de pago o reorganización, o el relevo de las presiones financieras que lo llevaron a la quiebra. *Peerles Oil v. Hnos. Torres Pérez*, supra, pág. 257. Para determinar los bienes que integraran el caudal objeto de quiebra, el deudor tiene la obligación de presentar un listado actualizado de sus activos y pasivos. *CMI Hospital v. Depto. Salud*, supra, pág. 322. Durante el procedimiento de quiebra, el síndico o deudor en posesión asume el control de todos los bienes del patrimonio de quiebra para mantener su valor y asegurar posteriormente su adecuada distribución. *In re García,* 553 B.R.1, (Bankr. D.P.R. 2016). El referido control de bienes funciona como medida de seguridad para evitar la posible interferencia de acreedores que intenten poseer o controlar los bienes del caudal de quiebra. *Id.*

El Código de Quiebras establece una serie de prohibiciones para salvaguardar el patrimonio del deudor durante la paralización automática y promover una asignación equitativa del crédito que le corresponde a cada acreedor. Véase, *In re García,* supra. De esta manera, se evita el despilfarro de los activos del deudor ante posibles embargos de los acreedores. *Id.* Así pues, la existencia de una paralización automática impide, entre otras acciones, las siguientes: el comienzo o la continuación de cualquier acción judicial o administrativa en contra del deudor, pendiente o que pudo comenzar antes del inicio de la petición de quiebra; el inicio de acciones con el fin de recuperar reclamaciones realizadas con anterioridad a la petición; la ejecución de sentencias contra el deudor o su propiedad obtenidas antes de la presentación de la petición; cualquier acción para ejercer control sobre la propiedad del caudal de quiebra; **cualquier acción para crear, perfeccionar o hacer efectivo un gravamen en una propiedad que pertenece al caudal** o para crear, perfeccionar o hacer

efectivo un gravamen contra la propiedad del deudor, cuando el referido gravamen asegura una propiedad que surgió antes de la petición de quiebra. 11 USC. 362(a); (Énfasis Suplido). *BPR v. SLG Goméz-López,* supra, pág. 330; *Peerles Oil v. Hnos. Torres Pérez*, supra*,* pág. 255-256; *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 491 (2010); *CMI Hospital v. Depto. Salud*, supra, pág. 322. Véase, además, Instituto de Estudios Judiciales, Oficina de Administración de los Tribunales, revisado por L. Figueroa Rivera, *La Paralización Automática de la Ley de Quiebras*, 1998, pág. 9-10.

Los tribunales están llamados a evaluar con rigor las violaciones a la suspensión automática. *Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969 (1er. Cir. 1997). No obstante, la paralización automática no es de aplicación absoluta. Su aplicabilidad está sujeta a ciertas excepciones. En lo atinente, la legislación sobre quiebras permite la realización de cualquier acto para perfeccionar un interés en la propiedad del deudor hasta el grado que los derechos y poderes del síndico estén sujetos a dicho perfeccionamiento. 11 USC sec. 546(b); véase, además, R. Martínez Mendosa, *La Quiebra y Usted*, Bros. Printing, Hato Rey, P.R., 1980, pág. 121.

A modo ilustrativo, se hace meritorio señalar algunos casos resueltos por los tribunales federales con relación a la paralización automática. Particularmente, controversias en las que la referida paralización ha operado, dado a la existencia de actos por medio de los cuales se crea o perfecciona un gravamen de forma ilegal durante la vigencia de dicha paralización. De igual modo, es pertinente reseñar algunos casos en los que la paralización automática, de forma excepcional no ha aplicado, toda vez que las actuaciones de los acreedores han logrado viabilizar el perfeccionamiento de un derecho preexistente a la petición de quiebra sobre la propiedad del deudor. Veamos.

En *In re 229 Main Street Ltd. Partnership*, 262 F. 3d 1 (1er. Cir. 2001), el referido Circuito tuvo la oportunidad de resolver si la paralización

automática impide que se constituya durante su vigencia un gravamen ambiental sobre la propiedad del deudor. En este caso particular, el Primer Circuito válido la existencia del gravamen en controversia, dado que fue debidamente perfeccionado y no infringió las salvaguardas de la paralización automática.

Surge de los hechos del precitado caso, que el deudor era dueño de un Centro Comercial en Massachusetts cuyas instalaciones fueron contaminadas con productos químicos. Ante ello, el Departamento de Protección Ambiental invirtió varias sumas de dinero en limpieza de emergencia para evitar la contaminación del agua potable. La aludida entidad ambiental notificó al deudor mediante misiva su intención de registrar un gravamen para garantizar los costos de limpieza presentes y futuros. El deudor impugnó algunos de los gastos incurridos por la entidad ambiental y se comenzó un proceso administrativo al respecto. Antes de concluir dicho proceso, el deudor presentó una petición de quiebra a tenor del Capítulo 11.

En el precitado caso, el Primer Circuito repasó la doctrina jurídica sobre la paralización automática. Resumió, que dicha paralización impide que se lleve a cabo cualquier acción para intentar crear, perfeccionar o hacer cumplir un gravamen. Salvo, que el acreedor posea un interés propietario sobre la propiedad del deudor y realice acciones para su perfeccionamiento. La referida excepción está sujeta a la existencia de los siguientes requisitos: (1) la realización de un acto conducente al perfeccionamiento; (2) la existencia de un derecho sobre la propiedad del deudor; y (3) que se cumplan los límites dispuestos en la sección 546 del Código de Quiebras.

Cabe señalar, que el Primer Circuito reconoce que la existencia de un gravamen depende de cualquier ley generalmente aplicable que permita la perfección de un interés propietario sobre los bienes del deudor. Es por ello que, para validar la existencia del gravamen en disputa, el Primer Circuito tuvo que analizar las legislaciones de Massachusetts aplicables a

la cuestión litigiosa. Además, el aludido circuito concluyó que el término "interés propietario" no es sinónimo de gravamen. Es más amplio que dicho concepto, por lo cual se extiende más allá de sus contornos. En el análisis del caso, el Primer Circuito determinó que la entidad ambiental tenía un interés propietario sobre la propiedad del deudor. Primero, dado que comunicó sus intenciones de registral el gravamen. Segundo, por demostrar una participación activa en el proceso administrativo incoado por el deudor; y tercero puesto que sus intenciones de registrar el gravamen se vieron obstaculizadas por las acciones de dicho deudor.

Finalmente, el Primer Circuito esbozó los siguientes requisitos atinentes a la excepción sobre perfeccionamiento de título posterior a la ocurrencia de una paralización automática. Estos son los siguientes: a) El acreedor debe actuar de conformidad a la ley de aplicación general; b) dicha ley debe permitir al acreedor perfeccionar un interés en la propiedad; y c) tal perfeccionamiento debe ser efectivo contra un derecho previamente adquirido en la propiedad.

Como continuación de esta exposición casuística, la controversia que tuvo ante sí el Primer Circuito en *Sotos Ríos v. Banco Popular*, 662 F.3d 112 (2011), ha servido de base para la resolución futura de cuestiones similares. En este caso, la parte deudora suscribió tres (3) escrituras para los años 2004 y 2005. Entre las que se encontraban unos instrumentos públicos sobre gravámenes hipotecarios a favor de Banco Popular. El Banco Popular presentó las escrituras al Registro de la Propiedad de Puerto Rico. Ante los atrasos en el proceso de inscripción, las referidas escrituras quedaron pendientes de calificar. Tres (3) años después la parte deudora se acogió al proceso de quiebra.

El Primer Circuito concluyó, que a pesar de que la presentación de una escritura de constitución de hipoteca no crea de por sí un gravamen hipotecario, puede establecer un interés propietario sobre los bienes del deudor. Bajo las circunstancias del precitado caso, el Banco Popular aseguró su interés propietario al presentar válidamente las escrituras casi

tres (3) años antes de la presentación de la solitud de quiebra. A tenor de ello, el Primer Circuito determinó que, bajo el curso ordinario registral, las referidas escrituras razonablemente se hubieran inscrito antes de la vigencia de la paralización automática, ya que hasta el momento no se había notificado que tuvieran algún defecto no subsanado.

Posteriormente, el tribunal de quiebras de Puerto Rico dispuso del caso *Carrión v. USDA Rural Hous Serv.,* (In re Roldan) (Bankr. D.P.R. 13 de junio de 2012). En esta ocasión, el 16 de abril de 1998, la parte deudora adquirió un inmueble mediante un préstamo hipotecario a favor de la acreedora USDA. La aludida acreedora presentó la Escritura de Hipoteca ante el Registro de la Propiedad de Puerto Rico y luego la retiró. Finalmente, el 3 de noviembre de 2010, dicha escritura se presentó nuevamente en el Registro de la Propiedad. Trece (13) días después de dicha presentación, la parte deudora se acogió al Capítulo 13 de la legislación de quiebras federal. La Corte de Quiebras determinó, que USDA recibiría mayor compensación que otros acreedores por la cercanía en tiempo de la presentación de la escritura en el Registro de la Propiedad y la radicación de la solicitud de quiebra. En consecuencia, el tribunal anuló la inscripción registral y reconoció la acreencia de USDA como una no asegurada.

Otro ejemplo casuístico es *Hernández v. Banco Popular (In re Hernández)* (Bankr. D.P.R. 2016). En este caso, el 31 de mayo de 2008, los deudores adquirieron un bien inmueble mediante compraventa y en la misma fecha otorgaron Escritura de Constitución de Hipoteca. El 24 de junio de 2008, dichas escrituras fueron presentadas ante el Registro de la Propiedad de Puerto Rico. Posteriormente, el 8 de agosto de 2012, los deudores y el Banco otorgaron una Escritura de Modificación y Cancelación Parcial de Hipoteca. El 8 de enero de 2013, el Registrador notificó defectos en la Escritura de Compraventa y en la Escritura de Modificación y Cancelación Parcial de Hipoteca. Ante ello, el 27 de febrero de 2013, el Banco presentó una reconsideración ante el Registrador. Así pues, estando

los documentos presentados y pendientes de inscripción en el Registro de la Propiedad, el 24 de marzo de 2015, los deudores se acogieron al Capítulo 13 de la legislación de quiebras federal.

Ante tales hechos, de forma similar a *Sotos Ríos v. Banco Popular*, supra, la Corte de Quiebras tuvo la oportunidad de dilucidar si una Escritura de Hipoteca pendiente de inscripción en el Registro de la Propiedad se puede considerar un crédito garantizado bajo la legislación de quiebras federal. El tribunal respondió en la afirmativa. Concluyó, que la parte deudora se obligó válidamente al pago de una deuda; la documentación pertinente se presentó ante el Registro de la Propiedad; y la institución bancaria reafirmó su derecho a solicitar inscripción a través de la presentación de una reconsideración que impugnaba los defectos notificados. Por lo tanto, declaró que el gravamen hipotecario gozaba de validez.

En el mismo año, la Corte Federal de Quiebras, tuvo ante sí los hechos del caso *In re Ramos,* 493 BR 355 (Bankr. D.P.R. 2016). En este caso, el 26 de junio de 2008, la parte deudora adquirió mediante escritura la propiedad en disputa. En la misma fecha, suscribió Pagaré Hipotecario a favor de RG Premier Bank. El 7 de julio de 2008, ambas escrituras fueron presentadas ante el Registro de la Propiedad vía fax. Los asientos de presentación caducaron el 1 de agosto de 2008, por no haberse completado una presentación física de los documentos en el tiempo requerido. Así las cosas, el 6 de noviembre de 2008, se presentó nuevamente la Escritura de Hipoteca en el Registro de la Propiedad, pero se omitió la presentación de la Escritura de Compraventa. Luego, el 4 de noviembre de 2010, la parte deudora presentó una petición de quiebra bajo el Capítulo 13. Posteriormente, el 21 de marzo de 2011, a aludida Escritura de Hipoteca logró su inscripción a través de la Ley para Agilizar el Registro de la Propiedad, Ley Núm. 216-2010, 30 LPRA sec. 1821 et seq.

La Corte Federal expresó que, al inicio de los eventos, el Banco tuvo un interés propietario sobre los bienes del deudor, puesto que presentó los

instrumentos públicos en el Registro de la Propiedad dos (2) años antes de la petición de quiebra. Sin embargo, distinguió los hechos del precitado caso de los sucesos reseñados en *Sotos Ríos v. Banco Popular*, supra. Al respecto, razonó que en este caso el Banco dejó de asegurar su crédito personal al no presentar la Escritura de Compraventa antes del inicio del procedimiento de quiebra. Consecuentemente, determinó que el Banco no realizó todas las gestiones administrativas necesarias para lograr una legítima inscripción del gravamen hipotecario. Ante ello, concluyó que la deuda del Banco no estaba garantizada debido a la ausencia de tracto sucesivo. Expresó, que si ambas escrituras se hubieran eficazmente presentado, la suspensión automática no tendría efecto sobre el gravamen en cuestión.

Mas recientemente, el Tribunal de Quiebras tuvo ante sí el caso de *Puntas Assocs, LLC v. Wiscovitch-Rentas (In re, Puntas Assocs, LLC.), 621 B.R. 85 (*Bankr. D.P.R. 2021). La controversia del referido caso se reduce a lo siguiente: ¿Puede un acreedor poseer un interés propietario sobre los bienes de un deudor en quiebra ante un escenario en el que el Registrador de la Propiedad notificó deficiencias en las escrituras presentadas, el notario autorizante retiró las escrituras de compraventa e hipoteca, y éstas terminaron presentándose nuevamente en una fecha posterior a la presentación de la solicitud de quiebra? Ante dicha controversia, el tribunal concluyó que se violentó la suspensión automática. En consecuencia, dictaminó la nulidad del gravamen hipotecario.

Según se desprende del análisis de los precitados casos, en este tipo de controversias convergen doctrinas jurídicas federales y estatales. Ante ello, las Cortes Federales y nuestro más Alto Foro han expresado que los tribunales federales y estatales tienen jurisdicción concurrente para interpretar la paralización automática y su aplicabilidad a los casos que se presenten. Véase, *Lab. Clínico et al. v. Depto. Salud et al.*, 198 DPR 790, 791-792 (2017); *In re, Baldwin-United Corp. Litigation*, 765 F.2d 343, 347 (2nd Cir. 1985). En lo relacionado a los derechos propietarios de las partes

interesadas, la casuística ha reconocido que su extensión y vigor se rige por la ley estatal aplicable. Véase, In re Cancel, 7 F. 4th 23 (1er. Cir. 2021); *In re Ramos,* 493 BR 355 (Bankr. D.P.R. 2016): *Raleigh v. Ill. Dep't of Revenue,* 120 S.Ct. 1951 (2000). Sobre el particular, es meritorio resaltar lo siguiente:

> Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. The "basic federal rule" in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law. Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. [Citas omitidas]. *Raleigh v. Ill. Dep't of Revenue,* supra.

**III.**

La postura del peticionario se resume en que la hipoteca en controversia adolece de nulidad, puesto que se presentó en el Registro de la Propiedad durante la vigencia de la paralización automática establecida en la sección 362 (a) del Código de Quiebras de los Estados Unidos. Ante la alegada violación a la paralización automática, el peticionario argumenta que procede la suspensión del proceso de ejecución de sentencia y que se declare la nulidad de la inscripción registral de la hipoteca en disputa.

Por su parte, el Banco Popular sostiene que los tribunales estatales carecen de jurisdicción sobre la materia para resolver la existencia de una violación a la paralización automática, toda vez que la legislación sobre quiebras es materia de autoridad federal. De igual modo, arguye que el peticionario no agotó los remedios administrativos bajo el protocolo administrativo de la ley FIRREA. A su vez, asevera que el peticionario no levantó la referida violación a la paralización automática en el momento en que advino en conocimiento de su existencia. Además, alega que el peticionario presentó dos (2) causas de acción ante el foro federal, en las que solo se limitó a cuestionar la orden de descargue y no la supuesta violación a la paralización automática.

Cónsono con lo anterior, el Banco Popular levanta la defensa de cosa juzgada. Sobre el particular aduce, que el peticionario impugnó la

validez de la deuda en cuestión en el tribunal federal y abandonó las reclamaciones entabladas. En vista de lo anterior, sostiene que al presente el peticionario no puede levantar una violación a la paralización automática. A su vez, argumenta que en la actualidad no existe una paralización automática vigente, ya que culminó el proceso de quiebra. En consecuencia, sostiene que no existe una paralización automática que pueda ser violada o invocada.

Evaluados los planteamientos de las partes, *expedimos* al amparo de la Regla 40, *supra,* el recurso de *certiorari* presentado y con ello *revocamos* la determinación post-sentencia recurrida. En consecuencia, declaramos la nulidad del gravamen hipotecario en disputa. A continuación, expondremos los fundamentos que motivan tal decisión.

La resolución de la presente controversia implica una interacción entre la legislación federal de quiebras y la legislación local sobre la constitución de un gravamen hipotecario en el Registro de la Propiedad. Según se desprende del expuesto marco doctrinal, los tribunales estatales tienen autoridad para interpretar la paralización automática y su aplicabilidad a los casos en litigio. *Lab. Clínico et al. v. Depto. Salud et al,* supra, pág. 791-792; *In re, Baldwin-United Corp. Litigation,* supra. Además, el foro federal ha reconocido que los derechos de propiedad de las partes litigantes, particularmente su alcance y validez, se rigen por la ley local aplicable. *Puntas Assocs, LLC v. Wiscovitch*-Rentas, supra; *In re Ramos,* supra. Bajo la referida interpretación doctrinal, la existencia y validez del gravamen hipotecario en controversia es un asunto que se conduce de conformidad a nuestro ordenamiento registral inmobiliario en interacción con la interpretación de la paralización automática. Tenemos facultad para entender sobre ambas cuestiones de derecho.

Atendido el asunto jurisdiccional, los tribunales federales han interpretado que las violaciones a la paralización automática son nulas y sin efecto. Véase, *Schwartz v. United States*, 954 F. 2d 569 (9th. Cir, 1992); *Kalb v. Feuerstein,* 308 US 433 (1940). No obstante, la aplicabilidad de la

paralización automática se dirige por una serie de parámetros normativos. Según discutido, de ordinario la paralización automática prohíbe que un acreedor controle el patrimonio del deudor en quiebra, o cree, perfeccione o haga efectivo un gravamen sobre la propiedad que pertenece al deudor. La aludida normativa general no es de aplicación automática, pues goza de unas numeradas excepciones. El foro federal ha reconocido el perfeccionamiento de un gravamen a favor de un acreedor, siempre y cuando éste posea un interés propietario sobre bienes del deudor, cuyo surgimiento sea de fecha anterior a la petición de quiebra. Es preciso destacar, que el foro federal ha expresado que el concepto de interés propietario es más amplio que el concepto de gravamen, por lo cual sus efectos se extienden a un número mayor de escenarios.

Según esbozado, la existencia de un interés propietario depende de la totalidad de las circunstancias y se evalúa de conformidad a la legislación estatal aplicable. En dicho análisis son de pertinencia los siguientes requisitos: a) El acreedor debe actuar de conformidad a la ley de aplicación general; b) dicha ley debe permitir al acreedor perfeccionar un interés en la propiedad; y c) tal perfeccionamiento debe ser efectivo contra un derecho previamente adquirido en la propiedad. Véase, In re 229 Main Street Ltd. Partnership, *supra*.

Al examinar la existencia de un interés propietario a favor de un acreedor, los tribunales federales, en casos similares al presente, han concluido que basta con que una escritura de constitución de hipoteca sea debidamente presentada en el Registro de la Propiedad de Puerto Rico. Véase, *Sotos Ríos v. Banco Popular*, supra. De igual modo, la existencia de dicho interés propietario también depende de que los acreedores demuestren actos afirmativos de diligencia que mantengan en vigor sus derechos. Según se desprende de los casos federales previamente resumidos, la falta de tracto al presentar una escritura de hipoteca; el dejar caducar el asiento de presentación por no corregir defectos notificados por el Registrador; y hasta la presentación de una escritura de hipoteca en

fecha cercana a la petición de quiebra, constituyen ejemplos de acreedores que no lograron demostrar el interés propietario requerido. Por consiguiente, en dichos casos se dictaminó que los actos a destiempo de los acreedores violentaron la paralización automática. En consecuencia, los tribunales concluyeron que el acreedor únicamente tenía un crédito personal no garantizado.

En el presente caso, surge del expediente ante nuestra consideración que, el 30 de octubre de 2007, el peticionario suscribió una escritura intitulada *"Primera Hipoteca"* a favor de Doral Mortgage Corporation, Inc.[3] Asimismo, se desprende del referido expediente que, el 6 de mayo de 2009, el peticionario se acogió al Capítulo 13 de la legislación de quiebra federal.[4] De igual modo, surge del aludido expediente que, el 4 de noviembre de 2011, se presentó la escritura sobre *"Primera Hipoteca"* en el Registro de la Propiedad de Puerto Rico.[5] Cabe mencionar, que el 16 de septiembre de 2014, el caso de quiebra fue cerrado y se decretó el descargue de las deudas.[6]

Así las cosas, el Banco Popular advino tenedor del pagaré hipotecario objeto de litigio y presentó una acción *in rem* de ejecución de hipoteca el día 18 de febrero de 2022. Tras el dictamen de una *"Sentencia"* en rebeldía, el peticionario solicitó la paralización de la venta en pública subasta del bien inmueble en cuestión, bajo el argumento de que la hipoteca en disputa adolece de nulidad. La referida paralización fue denegada por el tribunal de instancia.

De conformidad a la precitada casuística y a la naturaleza constitutiva de nuestro derecho hipotecario, determinamos la nulidad de la hipoteca objeto de litigio por violentar la paralización automática. Según expuesto, una vez presentada la petición de quiebra ningún acreedor

---

[3] Véase, anejo "Escritura 1" de la Entrada Núm. 9 del Sistema Unificado de Administración y Manejo de Casos (SUMAC).

[4] Véase, anejo intitulado "Notice of Bankruptcy Case Filing" de la Entrada Núm. 35 de SUMAC.

[5] Véase, anejo intitulado "Folio Karibe" de la Entrada Núm. 35 de SUMAC. Para información adicional de la hipoteca, véase también el anejo "Estudio de Título" de la Entrada Núm. 9 de SUMAC.

[6] Véase, anejo "Discharge" de la Entrada Núm. 35 de SUMAC.

puede crear o perfeccionar un título a su favor. Salvo que tenga un interés propietario de vigencia anterior a la petición de quiebra. El Banco Popular no cumple con los requisitos para ser acreedor de dicha excepción.

De entrada, no surge del expediente ante nuestra consideración que el referido Banco haya realizado algún acto para presentar la *"Primera Hipoteca,"* previo a la radicación de la petición de quiebra. Se reitera que ha sido resuelto por el foro federal que todo acreedor debe cumplir con la ley estatal aplicable para ser titular de un interés propietario. Siendo así, en nuestro ordenamiento legal la hipoteca adviene a la vida jurídica mediante inscripción registral, y para ello debe existir un acto previo de presentación y a su vez el instrumento público debe superar la calificación del Registrador. Solo así la hipoteca nace y tiene efecto real.

Los argumentos del Banco Popular se sintetizan en aspectos jurisdiccionales y de cosa juzgada. Ante ello, su defensa carece de planteamientos dirigidos a los actos afirmativos, si alguno, que realizó en aras de obtener un interés propietario sobre los bienes del peticionario en fecha anterior a la ocurrencia de la paralización automática. Independientemente de lo anterior, en el presente caso no opera la doctrina de cosa juzgada, puesto que el foro federal no resolvió la presente controversia y desestimó las dos (2) reclamaciones incoadas sin entrar en los méritos de estas. Por consiguiente, la presente causa de acción no es una controversia ya litigada y adjudicada. Véase, *Landrau Cabezudo y otros v. Autoridad de los Puertos de Puerto Rico y otros*, 2025 TSPR 7.

De otra parte, el Banco Popular sostiene que no es meritorio examinar los efectos de una paralización automática, ya que esta no permanece vigente y el caso de quiebra se cerró. Conforme esbozado, una actuación en violación a la paralización automática adolece de nulidad. Es sabido, que lo nulo carece de efecto alguno, dado que no emerge a la vida jurídica. Así pues, no es posible convalidar un gravamen hipotecario que nunca debió advenir a la vida jurídica por estar en contravención del Código de Quiebras de los Estados Unidos.

Nótese, que la legislación federal de quiebras no solo protege el patrimonio del deudor durante la paralización automática, sino que funge como una medida de seguridad para garantizar la debida distribución del caudal objeto de quiebra y que ningún acreedor reciba mayor compensación que otro. En vista de ello, si validáramos la presente ejecución de hipoteca existirían las siguientes consecuencias: 1) Se desvirtuarían los efectos de la paralización automática y con ello la primacía del Código de Quiebras Federal; 2) Se resolvería en detrimento de toda la serie de casos federales similares al presente y en contravención de la naturaleza constitutiva de nuestro derecho hipotecario; y 3) Se promovería que el Banco Popular pudiera recibir mayor compensación que los otros acreedores, lo que podría violentar el plan de pago y el descargue de deudas, según establecido por la Corte de Quiebra Federal.

Así pues, de conformidad a los fundamentos que anteceden y a lo expuesto en la precitada casuística federal, determinamos la nulidad del gravamen hipotecario en controversia. Los derechos del Banco Popular se reducen a una obligación personal no garantizada, que está sujeta a lo resuelto en el caso federal de quiebras.

**IV.**

Por los fundamentos que expondremos a continuación, *expedimos* a tenor de la Regla 40, *supra*, el auto de *certiorari* presentado. En consecuencia, *revocamos* la determinación recurrida y con ello decretamos la *nulidad* del gravamen hipotecario en cuestión. Ante ello, los procesos de ejecución de hipoteca no deben seguir su curso por estar amparados en una *"Sentencia"* que concedió la ejecución de una hipoteca que no advino a la vida jurídica.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones